UNITED STATES of America, Plaintiff-
Appellant,

v.

Donald A. CYZEWSKI, a/k/a J. Scalzi,
and James Peter Herbert, a/k/a
J. Daly, Defendants-Appellees.

No. 72–3368.

United States Court of Appeals,
Fifth Circuit.

Aug. 29, 1973.

**510**

John L. Briggs, U. S. Atty., Jacksonville, Fla., Claude H. Tison, Jr., Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellant.

Thomas E. Henderson, Tampa, Fla., court-appointed, for Herbert.

W. DeHart Ayala, Jr., Tampa, Fla., for Cyzewski.

Before THORNBERRY, AINSWORTH and RONEY, Circuit Judges.

RONEY, Circuit Judge:

In this case, an airport security search goes one step further than any to which this Court has previously given constitutional approbation. We are asked to discern any constitutional defects in the removal and warrantless search of checked luggage as part of the investigation of potential hijackers. The Government appeals, under the authority of 18 U.S.C.A. § 3731, from the District Court's suppression as evidence of five pounds of marijuana discovered by the search. We reverse.

On October 5, 1971, at Tampa International Airport, James P. Herbert and Donald A. Cyzewski, traveling on a group ticket under the names of J. Daly and J. Scalzi, respectively, sought to board Eastern Air Lines Flight No. 114 to Atlanta. At the boarding area, ticket attendants pointed them out to deputy United States marshals as potential hijackers, or "selectees," according to characteristics described in the confidential Federal Aviation Agency's Behavior Pattern Profile.

Deputies Charles Johnston and John Hardman accosted the defendants and requested them to furnish identification. The airline tickets with the false names were presented, and the defendants explained that all their identification papers were inside their luggage, which had been checked. To confirm the identification, the deputies gave the baggage checks to an airlines' employee with instructions to retrieve the luggage from the plane and then escorted the defendants to the marshal's office near the boarding area.

As the luggage was brought to the office, both Herbert and Cyzewski removed from their pockets and presented to the marshals identification with their real names. The defendants made no explanation regarding the false names on the tickets. Upon requests, they refused to open their luggage for inspection, but did agree to be subjected to the magnetometer test for metal objects.

The magnetometer indicated, when Herbert stepped through it, that he had no metal on his person. Deputy Johnston next requested Herbert to pass through the device with his bag, a small, plaid, zippered suitcase. This time the magnetometer detected metal.

Deputy Johnston placed the bag on a desk, explained the results of the magnetometer test to Herbert, and requested to see the metal object. At first refusing to open the bag, Herbert stated that the only metal objects in it were buckles on a pair of shoes and volunteered to be subjected to the magnetometer test again if he could remove the shoes from the suitcase. Without receiving a reply from the marshals, Herbert unzipped one side of the bag and placed his hand inside and out of view. At that point, Deputy Hardman, exclaiming, "I'll take over from here," grabbed the bag.

Deputy Hardman opened the suitcase, began to search it, and found an aerosol can. He then removed a five-pound bag and asked Herbert about its contents. It was laundry, replied the defendant. Unconvinced, the deputy opened the bag and discovered five pounds of marijuana.

The defendants were immediately arrested and transported to jail. The motion to suppress was granted after the defendants were charged with possession with intent to distribute marijuana, in violation of 21 U.S.C.A. § 844.

This Court's task is to determine any constitutional infirmity in the search of Herbert's luggage. In the context of the exigent circumstances of this case and the plight of American aviation, we deem the search to have been reasonable.

Airplane hijacking, the unlawful seizure and diversion of aircraft to unscheduled destinations, is a contemporary phenomenon with potentially catastrophic consequences.[1] The high incidence of air piracy—jeopardizing passengers' lives, threatening commercial airlines' personnel and property, wreaking substantial economic loss upon both, and inhibiting citizens' exercise of the constitutional right to travel[2]—has demonstrated civil aviation's urgent need for security measures.

In response to this ubiquitous hijacking menace, the Federal Aviation Agency has established an elaborate pre-flight passenger surveillance system. With deterrence as their fundamental objective, a series of obstacles has been posed for potential hijackers: an identifying behavioral profile, an electronic examination, interrogation, and a physical search. Although all passengers today are subjected to the magnetometer and search of hand luggage, there seems to have been no mandatory procedure for screening passengers at the time of the subject incident. Generally, airlines' personnel would designate an individual as a "selectee" on the basis of the profile and would request identification. If there were any confusion regarding the selectee's identity, he would be interrogated and subjected to the magnetometer test by the airline's officer or an air marshal. If metallic objects were detected on his person, he probably would be frisked for weapons.

Recently, our Court in United States v. Moreno, 475 F.2d 44, 45 (5th Cir. 1973), performed the "difficult and sensitive task of balancing the individual rights protected by the fourth amendment against the overwhelming. public interest in effective protection from the threat posed by air piracy" and sustained a search which revealed heroin, rather than weapons. We held that, where Moreno appeared evasive and hesitant and lied about his destination when confronted by police, security officials had a legitimate interest in making a conclusive determination regarding the subject's conduct and presence at the airport. Expressing the belief that the sheer urgency of the current air piracy problem alone is insufficient justification for a warrantless airport search, we recognized, nevertheless, that reasonableness is the ultimate standard to guide the constitutional propriety of the warrantless airport search.

Two other airport security searches have subsequently been considered by this Court. In United States v. Skipwith, 482 F.2d 1272 (5th Cir. 1973), we analogized the search of persons presenting themselves for boarding an air carrier to a border search and held that such searches may be based on mere or unsupported suspicion. Because Skipwith met the FAA anti-skyjack profile and stated he had no identification, a boarding agent detained him. The federal marshal discovered that the name on the defendant's ticket was false, brought him

1. *See* Abramovsky, "The Constitutionality of the Anti-Hijacking Security System," 22 Buff.L.Rev. 123 (1972); *Note*, "Airport Security Searches and the Fourth Amendment," 71 Colum.L.Rev. 1039 (1971); McGinley and Downs, "Airport Searches and Seizures," 41 Ford.L.Rev. 293 (1972).

2. The right to travel was early recognized as one of the privileges and immunities enjoyed by American citizens. *See* Corfield v. Coryell, 6 Fed.Cas. p. 546 (No. 3230) (C.C.E.D.Pa. 1825); *see also* Edwards v. California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941) (Douglas and Jackson, JJ., concurring); and Twining v. New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908). Recent constitutional jurisprudence has established that the right to travel emanates from the Due Process clause of the Fifth Amendment to the United States Constitution. *See* Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); Aptheker v. Sec'y of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964); Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958).

into his office, and—suspecting that a bulge in the suspect's pocket was a gun—ordered him to empty his pockets, revealing a plastic bag of cocaine. The Court concluded that the marshal

> was justified in undertaking a search with sufficient scope to reveal any object or instrumentality that Skipwith could reasonably have used to effect an act of air piracy.

*Skipwith, supra,* 482 F.2d at 1277. Thus, the Fourth Amendment does not require suppression of narcotics found when the airline ticketholder is searched for weapons on the basis of mere suspicion by a federal marshal at the boarding gate.

The rationale of *Moreno* was the basis of this Court's decision in United States v. Legato, 480 F.2d 408 (5th Cir. 1973). There, the FBI had received an anonymous tip, Legato's conduct and hand baggage matched the information, and he and his companion departed from the terminal building to the airport parking lot when it was announced that their flight had been delayed because of a bomb threat. Approached by security officers, Legato, who was using an assumed name, denied both ever possessing the subject bag and being acquainted with his companion, who was carrying the bag and who consented to the search in the parking lot. We held that the tip and deceit provided a sufficient factual basis for the federal agent's fear of a hijack.

Although some searches in the vicinity of air terminals, thereby generally regarded as "airport searches," have been found unlawful, *see, e. g.,* United States v. Soriano, 482 F.2d 469 (5th Cir. 1973); United States v. Garay and Torres, 477 F.2d 1306 (5th Cir. 1973); and Gold v. United States, 378 F.2d 588 (9th Cir. 1967), these are unrelated to the security problem. The courts have consistently held airport security measures constitutionally justified as a limited and rela-

tively insignificant intrusion of privacy balanced against the need to protect aircraft and its passengers. United States v. Bell, 464 F.2d 667 (2d Cir. 1972); United States v. Slocum, 464 F.2d 1180 (3rd Cir. 1972); United States v. Epperson, 454 F.2d 769 (4th Cir.), cert. denied, 406 U.S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972).

In *Bell,* the magnetometer's use was found to be constitutionally sound.[3] Defendant Bell matched the behavioral profile, activated the magnetometer, and identified himself for the federal marshal at the airport as having recently been released from prison on bail. The marshal searched him, requested that he remove a hard object which proved to be a brown paper sack, and found heroin therein. Defendant's motion to suppress the evidence as the product of an unlawful search was denied.

Although expressing some reservations had the search been based solely on the magnetometer test since that device is sensitive to common items carried by a large proportion of airlines passengers, the District Court approved the use of the magnetometer as "only one of a series of screening procedures; a procedure that serves as much as a deterrent to air piracy as it does a detector." United States v. Bell, 335 F.Supp. 797, 802 (E.D.N.Y.1971). The Second Circuit, noting the magnitude of the crime sought to be prevented and the time limitations which precluded the warrant procedure, affirmed the constitutionality of the magnetometer test as a reasonable precaution.

*Slocum* rests upon the same rationale. There, the defendant met the profile, activated the magnetometer, and was unable to produce identification. When a frisk disclosed nothing which would have activated the magnetometer, the marshal searched defendant's hand luggage and found a sock containing cocaine. Upholding Slocum's conviction for posses-

---

3. Although the magnetometer, a passive device which merely senses the deflections which ferrous metal causes in the earth's magnetic field, does not penetrate the individual or his property, Fourth Amendment problems are raised because "the reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure." Katz v. United States, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967).

sion of the narcotics, the Third Circuit found the search to be reasonable in the light of the defendant's lack of identification and failure to explain the activation of the magnetometer.

In *Epperson,* the defendant was not a "selectee," but triggered the magnetometer through which all passengers on his flight were required to walk, and a marshal's search of his person revealed a pistol. The Fourth Circuit held that, once the device detected metal, the frisk was lawful because of the marshal's reasonable fear that other passengers might be endangered:

> Since the use of the magnetometer was justified at its inception, and since the subsequent physical frisk was justified by the information developed by the magnetometer, and since the search was limited in scope to the circumstances which justified the interference in the first place, we hold the search and seizure not unreasonable under the Fourth Amendment.

454 F.2d at 772.

Even holdings apparently contrary to this line of authority were decided on grounds not affecting our decision. United States v. Ruiz-Estrella, 481 F.2d 723 (2d Cir. 1973), held illegal a marshal's search of the bag of a passenger who fit the profile, but who had done nothing suspicious and had not been subjected to the magnetometer test. The ground for the decision was not the unconstitutionality of the security procedures, but the failure of the marshal to subject the bag to the magnetometer test before the search. If the bag had not activated the magnetometer, reasoned the Court, no search would be necessary to satisfy the demands of the airport security measures. The search in United States v. Lopez, 328 F.Supp. 1077 (E.D.N.Y.1971), was found violative of the Fourth Amendment because the defendant was possibly singled out for search by an airline official's application of an unauthorized, revised profile. Yet the Court approved use of the behavioral profile-magnetometer-interrogation-frisk procedure. In United States v. Kroll, 351 F.Supp. 158 (W.D. Mo.1973), the Court held that—although the airport security agents acted legally in searching the carry-on luggage of a passenger who fit the hijacker profile, activated the magnetometer and, during inspection, failed to open the file section of his briefcase—the agents exceeded the bounds of reasonableness by opening a small envelope found in the file section. The ten grams of "speed" found in the 10″ x 4″ envelope, consequently, were inadmissible at the passenger's trial. Even these decisions, therefore, though holding the particular searches illegal, sustain airport security procedures.

█ Airport security measures are reasonable, therefore, insofar as they permit government agents to determine whether a suspect presents an immediate danger to air commerce. The search may continue until the law enforcement official satisfies himself that no harm would come from the passenger's boarding the plane. To be effective, the security efforts must focus not on a single aircraft or tangible item, but on the suspect himself, his demeanor and possessions during the entire course of his airport presence.[4] The marshal's duty is

---

4. This Court has made clear that an investigation need not be curtailed simply because a suspect decides not to take a particular flight. *See Skipwith, supra; Legato, supra.* We have expressly decided to reject the right-to-leave argument followed in United States v. Meulener, 351 F.Supp. 1284 (C.D.Cal. 1972). As Judge Bailey Aldrich stated in his dissent in *Skipwith,* a point with which the majority of that panel fully concurred,

"The reasoning in *Meulener,* that if he then changed his mind, and elected to leave, 'he would pose no danger to the passengers and crew on the aircraft,' 351 F.Supp. at 1289, greatly damages the prophylactic purpose of the search procedure. Such an option would constitute a one-way street for the benefit of a party planning airplane mischief, since there is no guarantee that if he were allowed to leave he might not return and be more successful. Of greater importance, the very fact that a safe exit is available if apprehension is threatened, would, by diminishing the risk, encourage attempts."
*Skipwith,* 482 F.2d at p. 1281.

to make a trained judgment, as expeditiously as possible, regarding the threat posed by an individual identified by the behavioral profile. Only when it becomes unreasonable for the suspect's innocence to be further questioned does the security search itself become unreasonable.

■ The question is whether the retrieval of checked baggage and the warrantless search of it over protest is consistent with this principle.

We sustain the search because at no point in the authorized security procedure did defendants' innocence become clear to the marshals. To the contrary, Herbert and Cyzewski suspended themselves in a quagmire of suspicion. Both were selectees subject to close scrutiny and interrogation. At first, they offered no identification and subsequently revealed that they had lied about both their identities and their nonpossession of identification. This reversal, coupled with initial refusals to permit inspection of the bags, focused attention on the luggage. When the magnetometer registered positive, the marshal reasonably surmised that the selectee's bag contained a metallic object, possibly a weapon. Having already jeopardized his credibility, Herbert could hardly have allayed the marshal's suspicion by stating that the device was activated by shoe buckles. Herbert opened the luggage only enough to reach his hand inside. The marshals could not determine what he might have removed. Apprehensive, Deputy Hardman reached for the suitcase unzipped it, and found a bag, which Herbert claimed to contain laundry.

It may be argued that, had the marshals subjected defendants to the magnetometer test—presumably with negative results—before ordering the removal of the luggage, there would have been no reason for the removal because, notwithstanding the confusion regarding identities, no metallic weapon would have been accessible to defendants. This theory, however, misreads the prophylactic purpose of the security system: not simply to single out those individuals who

carry aboard instruments dangerous to the aircraft, personnel and passengers, but to thwart potential hijackings by deterrence. Requiring positive identification of individuals who match the hijacker behavioral profile is an instrumental part of the deterrence system; and the airborne passenger's inability to fetch any weapon that might be concealed in his checked baggage does not gainsay the deterrent effect of removing luggage which allegedly contains the only means of identifying selectees.

■ Central to the District Court's holding was its conviction that the removal of the luggage was "not within the scope of the deputy's ordinary instructions under the anti-hijacking program" and was "without authority and in contradiction of the deputies' instructions." Deputy Johnston testified that his instructions sanctioned the demand of identification from and a magnetometer test of any persons fitting the profile. The limits of a constitutional search are not necessarily defined by the perimeter of a particular security system. The marshals' specified authority should not bar further investigation if, in the exercise of their professional judgment, their reasonable suspicions had not been allayed by the routine security check.

To test a law enforcement official's investigation in every context by the limits of his instructions seems to us an inappropriate, mechanistic approach. The District Court's reliance on *Lopez, supra,* to this end is misplaced. In *Lopez,* the deviation from the standard security procedure was in the application of the profile which triggered the investigation in the first place. There was, consequently, no objective basis for Lopez' designation as a selectee because the approved profile had not been used. Thus, the *Lopez* search was illegal not merely because of a deviation in procedure, but because the interference was not justified in the first place. Here, the designation of Herbert and Cyzewski as selectees, the legal impetus for the investigation, is not challenged.

Other alleged deviations from the prescribed security procedures have been dismissed as insubstantial. In *Bell, supra,* it was charged that the magetometer had been improperly reset to an excessively high sensitivity level, and in *Slocum, supra,* the defendant had not been required to pass through the magnetometer without his hand luggage before the frisk was conducted. Neither means of accomplishing the approved security tests was found to affect their validity. The same result is appropriate to the removal of a selectee's checked luggage when the identification papers which may clear him for passage are supposed to be found therein. As in *Slocum,* the marshals were simply seeking, within the ambit, if not the letter, of the anti-hijacking system, explanations for the apparent deception.[5]

■ A separate foundation for the District Court's holding was its decision that the defendants' conduct suggested not violent designs against others, but only efforts to evade detection of the contraband. This conclusion, however, results from viewing the marshals' actions from the defendants' subjective, contemporaneous position and from the retrospective knowledge that they were unarmed. The facts must be viewed from the standpoint of the marshals, in light of their information at the time. *See Moreno, supra* 475 F.2d at 50. In *Ruiz-Estrella, supra,* for example, where the defendant fit the profile, but provided no reason for suspicion and was not subjected to the magnetometer test, the Court viewed the facts through the eyes of the marshal in finding that the rationale of Terry v. State, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), would not support the search.

■ The District Court further thought it unreasonable for the marshal to open the brown bag of marijuana without first ascertaining whether it contained a hard substance. Such a test would serve little purpose in airport security searches because explosives can be soft as well as hard. The "pat down" is not an inflexible preliminary requirement for a search. *See* Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry, supra.* Similar to the search of the rolled sock in *Slocum, supra,* the examination of this bag was justified by the claim of lies and suspicious circumstances. There was even more reason here than in *Moreno, supra,* given the defendants' designation as selectees and their obvious duplicity, for the "[a]irport security officials . . . [to make] a conclusive determination with respect to . . . [the defendants'] conduct and presence in the airport." 475 F.2d at 52.

Only after every line of inquiry had failed to eliminate the probability of danger did the marshals examine the contents of Herbert's suitcase. To underscore the marshals' observance of defendants' rights, it must be noted that— after learning the nature of the concealed goods in Herbert's luggage and the true reason for the defendants' conduct, which apparently established their innocence as hijackers—the marshals left the two remaining bags untouched for warrant procedures.

Having concluded that this evidence was improperly suppressed, we reverse.

Reversed.

THORNBERRY, Circuit Judge (dissenting):

The exigencies of skyjacking and bombing, however real and dire, should not leave an airport and its environs an enclave where the Fourth Amendment has taken its leave. It is passing strange that most of these airport searches find narcotics and not bombs, which might cause us to pause in our rush toward malleating the Fourth Amendment in order to keep the bombs from exploding.

United States v. Legato, 5th Cir. 1973, 480 F.2d 408, 414 (Judge Goldberg, con-

---

5. Although Judge Aldrich has proposed an exclusionary rule to control overzealous searches, the suggestion has been rejected by this Court, *Skipwith, supra.*

curring). The majority recognize that the airport security search at issue in this case goes a step further than any we have previously approved. Specifically, that step is the retrieval of checked luggage well beyond the reach of the suspected skyjacker for the purpose of searching it. With deference, I cannot agree that the danger of air piracy warrants or authorizes upholding this search under Fourth Amendment standards.

Terry v. Ohio, 1968, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 has served as the foundation of the airport security search cases. Under *Terry* a policy officer with facts giving rise to a reasonable suspicion of criminal activity, but not supplying probable cause to arrest, may make a forcible "stop" for investigative purposes. *See also* Adams v. Williams, 1972, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612. Further, the officer may make a pat-down search of the suspect's outer clothing if he reasonably apprehends that the suspect may be armed and dangerous to the officer or others. Though probable cause is not required to legitimate the investigative stop or the protective search, the Court in *Terry* stressed that the policeman's suspicion of criminal activity and apprehension of danger must arise from "specific and articulable facts." 392 U.S. at 21, 88 S.Ct. at 1830. Additionally, the Court emphasized that, "The scope of the search must be 'strictly tied to and justified by'" its protective purpose. 392 U.S. at 18, 88 S.Ct. at 1878.

In United States v. Moreno, 5th Cir. 1973, 475 F.2d 44 our court applied the *Terry* holding to an airport search and extended it slightly. We concluded there that the facts available to the law enforcement officers—including unexplained comings and goings at the airport, a false explanation to investigating officers, visible nervousness, changing lines at the ticket counter and later changing airlines, and a bulge in the suspect's pocket—reasonably warranted the suspicion that he was armed and dangerous and was engaged in criminal activity, even though the facts did not supply probable cause. Further, we held that the great danger which each individual passenger represents to fellow passengers and flight crews as a potential skyjacker made reasonable under the Fourth Amendment a more intrusive search in the airport setting than *Terry* would authorize for on-the-street encounters. We said:

> Due to the gravity of the air piracy problem, we think that the airport . . . is a critical zone in which special considerations apply . . .
> In applying *Terry* were we to hold that airport officials must always confine themselves to a "pat down" search where there is a proper basis for an air piracy investigation, we think that such a per se restriction in the final analysis would be self-defeating.

United States v. Moreno, *supra* at 51. The intrusion which was upheld was the removal of the suspect's coat and an inspection of the contents of his pockets—somewhat more than a pat-down search. Again, the rationale for this extension was the great danger which skyjacking represents.

The *Moreno* principles were applied straightforwardly in United States v. Legato, 5th Cir. 1973, 480 F.2d 408 to uphold the search of a package carried by a suspect in an airport. Similarly, United States v. Slocum, 3d Cir. 1972, 464 F.2d 1180 upheld an extensive search of carry-on luggage with less than probable cause.[1]

1. In our Circuit not even reasonable suspicion is required to search passengers in the pre-boarding area. In United States v. Skipwith, 5th Cir. 1973, 482 F.2d 1272 we held that "those who actually present themselves for boarding on an air carrier . . . are subject to a search based on mere or unsupported suspicion." *Id.* at 1276. Consent is not required; the individual has no right to leave to avoid the search. *Id.* at 1277. *But see* United States v. Anderson, 9th Cir. 1973 [13 Crim. L.Rptr. 2395, June 29, 1973] (passenger searches are "administrative searches" whose validity depends on consent or obtaining a

Prior to the majority's decision today, no case has gone so far as to authorize the seizure and search of a passenger's checked luggage—I emphasize that we are not dealing here with a search of carry-on luggage—on the basis of suspicious conduct, *i. e.*, less than probable cause. *Terry, Moreno, Legato,* and *Slocum* all dealt with a search of the suspect's person, or of his clothing or packages in his immediate possession. None of them authorized retrieval and search of a distant piece of luggage or other distant property on the basis of facts creating only suspicion of wrongdoing. Even a probable-cause arrest of a suspect would not legitimate a search of his checked luggage as incident to the arrest. Chimel v. California, 1969, 395 U. S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. Nothing less than probable cause to believe that the checked bag contained something subject to seizure—contraband or fruits, instrumentality, or evidence of a crime—would authorize a valid search, even if a warrant were not required under the circumstances. See Warden v. Hayden, 1967, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782. Thus, in extending *Terry* to sustain a search of distant property in this case the majority go significantly beyond existing precedent.

Just as *Moreno* and *Legato* relied on the danger factor to uphold more intrusive searches in an airport setting than would be allowed outside an airport, contemplation of the "ubiquitous hijacking menace" and the "potentially catastrophic consequences of hijacking" has led the majority to approve the checked luggage search in this case. The day is past for questioning the soundness of the *Moreno* and *Legato* holdings, but we are not bound to, and should not, apply and extend their rationale uncritically to approve every search sought to be justified in the name of the skyjacking menace. Without minimizing the urgency of the air piracy problem, we must recognize limits to the extent of intrusion it can legitimate.

There can be no doubt that traditional Fourth Amendment principles and values are altered and ultimately inverted as we increase our reliance on the danger factor and the need for "security" to justify greater and greater intrusions. Traditionally, privacy has been regarded as the norm, and special justification has been required to permit a search. Probable cause is the traditional mechanism for balancing the individual interest in privacy against the public interest in detecting and preventing crime, even dangerous crime. *Terry* modified the equation only slightly by permitting a limited pat-down search of a suspect's person on reasonable suspicion of criminal activity plus reasonable apprehension of danger. As we accord greater weight and importance to the danger factor, whether as justification for the initiation of a search, *e. g.*, United States v. Skipworth, *supra,* or for enlarging its permissible scope, *e. g.*, United States v. Moreno, *supra,* search becomes more the norm and privacy more the exception. This drastic inversion of values is apparent in the majority opinion in this case.

> Airport security measures are reasonable, therefore, insofar as they permit government agents to determine whether a suspect presents an immediate danger to air commerce. The search may continue until the law enforcement official satisfies himself that no harm would come from the passenger's boarding the plane. . . Only when it becomes unreasonable for the suspect's innocence to be further questioned does the security search itself become unreasonable.

Reasonable suspicion, a vague and minimal standard at best, permits the initiation of the investigation. The individual, "the suspect," must then submit to an unlimited search until the search dem-

warrant). As in *Moreno* the reason given for the paring back of the individual's right of privacy in Skipwith was "the magnitude of

the perils created by air piracy." *Skipwith, supra at* 1275.

onstrates or he can otherwise convince the official that further intrusion is *not* warranted. We should be slow to increase our emphasis on the danger factor in Fourth Amendment analysis in the name of reasonableness, when the result will be to invert the fundamental values the Amendment represents.

In this case, I must conclude that the majority improperly allow a "protective" search to extend beyond the scope reasonably necessary to neutralize the threat of harm from appellants, as suspected skyjackers, to police officials and others. The scope of the search must be strictly tied to and justified by the circumstances which give rise to its initiation. In *Terry* the search was limited to a pat-down search of the suspect because weapons on the person of suspects represent a high risk to police and others. The Court observed:

> American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.

*Terry v. Ohio, supra,* 392 U.S. at 23–24, 88 S.Ct. at 1881. Elaborate, technically complex weapons not located on the suspect's person may be imagined which would also endanger police, but the search was limited to the suspect's person, the area which according to experience involves a high risk. To use the *Terry-Moreno* rationale to approve a checked luggage search we should be able to declare that would-be skyjackers commonly do, or at least reasonably could, use weapons or devices in checked luggage to commit air piracy. But the primary danger in the airport setting seems to be that the skyjacker will carry some weapon on board the aircraft with him. The screening procedures prescribed by the Federal Aviation Administration are designed to thwart the carry-on threat and do not provide for searching or mag-

netometer testing of checked luggage. *See* United States v. Slocum, *supra.* This seems to indicate that the FAA does not consider checked luggage to present a significant skyjacking danger. The record does not show that skyjackers commonly use devices in checked luggage, and I do not believe we may properly take judicial notice of the danger presented by any such hypothetical *modus operandi.* Unless the nexus between the checked luggage and the danger of air piracy is established, the "protective search" rationale cannot properly be used to uphold a checked luggage search. Being unpersuaded that checked luggage does represent a substantial skyjacking threat, I think the search went beyond its legitimate "protective" scope.

There is a second reason why the search in this case should not be upheld. Even if law enforcement officers could properly seize the checked bag or remove it from the aircraft for protective reasons, they had no authority to search it without a warrant. We have recently held in United States v. Soriano, 5th Cir. 1973, 482 F.2d 469 that police officers with probable cause to believe that a suitcase contained contraband were justified by exigent circumstances in seizing it without a warrant, but that they were obligated to secure a warrant before inspecting its contents. *See also* United States v. Garay, 5th Cir. 1973, 477 F.2d 1306. Yet the majority holds that the law enforcement officials in this case, who had only suspicion, and not probable cause to believe the bag contained any item subject to seizure, could seize *and search* the bag without a warrant. Surely, if a warrant is required for a probable cause search, no less can be required for a "reasonable suspicion" search. To decide this case consistently with *Soriano* and *Garay* we should reject the warrantless search of the checked bag.

I would affirm the ruling of the district court suppressing the marijuana found in the bag.