**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Michael A. PALAZZO and Rudolfo Castro**
**Viagran, Defendants-Appellants.**

**No. 73–1847.**

United States Court of Appeals,
Fifth Circuit.

Jan. 23, 1974.

charged Palazzo and Szpara jointly with possession of and intent to distribute marijuana. After the pre-trial motions to suppress the physical evidence and ⇀certain incriminating statements were denied, Palazzo and Viagran were found guilty by the trial judge on all counts. Szpara's case was severed before trial because of serious accidental injuries. Palazzo and Viagran each received a five-year term of imprisonment on Count I and special parole periods of five and two years respectively on the remaining counts. Because the search of his luggage by the airport security personnel impermissibly infringed Palazzo's Fourth Amendment rights, we must reverse his conviction. Inasmuch as Viagran lacks standing to assert the constitutional immunities of his co-defendant, he has no basis upon which to invoke application of the Exclusionary Rule; his conviction is therefore affirmed.

Like every search case, this one turns upon its facts. Deputy United States Marshal Mariano Granados had been working the anti-air piracy detail for several years when he observed Palazzo and Szpara as they arrived together by taxi at the San Antonio International Airport at 6:45 a.m. on the morning of August 1, 1972. Their extremely nervous and fidgety appearance as they entered the Eastern Airlines check-in area aroused his suspicion. He continued to observe them and noted that Palazzo approached Szpara, who had seated himself in the far corner of the waiting room. After they exchanged a few words, Szpara took some money from his pocket and handed it to Palazzo. As Palazzo took the money he attempted to hand Szpara a small white bundle (which later proved to be a towel), but it dropped to the floor as he hurriedly departed in the direction of the front terminal. Szpara picked up the bundle and placed it on a small table beside his seat.

·When the boarding call for the plane was given Palazzo was still absent. Szpara waited until all other passengers had left the waiting room, then moved

Phillip D. Hardberger, San Antonio, Tex., for Palazzo.

Alan Brown, San Antonio, Tex., for Viagran.

William S. Sessions, U. S. Atty., Joel D. Conant, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before THORNBERRY, SIMPSON and CLARK, Circuit Judges.

CLARK, Circuit Judge:

Michael A. Palazzo and Rudolfo Castro Viagran were joined in a three-count indictment with Wayne Szpara. Count I charged all defendants with conspiring to possess 73.1 pounds of marijuana with intent to distribute it in violation of 21 U.S.C. § 841(a)(1). Count II charged Viagran alone and Count III

toward the security check area with an obvious appearance of reluctance. As he passed through the gate, he "lit the magnetometer." In response to Marshal Granados' request for identification, Szpara produced a New Jersey driver's license receipt and consented to be searched. After Granados was unable to detect any metal objects during a pat-down search in the men's room, Szpara was asked to go back through the magnetometer and this time he failed to trigger the metal detector. He was told he could enter the airliner. Noticing that the bundle still lay on the table in the waiting area, Granados brought it to the waiting area, Granados brought it to Szpara's attention. Szpara denied knowledge of its ownership. When asked about the man who dropped it (Palazzo), Szpara stated that his only acquaintance consisted of a casual request for a small loan to enable this stranger to complete the price of an airline ticket.

Just before the plane was to depart, Palazzo returned to the airline ticket lift desk at this departure point. Upon Granados' request for identification, he produced a New Jersey driver's license. When Granados quizzed him about the bundle in the waiting area, Palazzo stated that he had no luggage and volunteered to be searched. This search revealed no dangerous objects. Granados did write down the numbers of two baggage claim stubs for future reference, after Palazzo had attempted to hide them when he was asked to empty his pockets. The Marshal permitted Palazzo to board the flight.

Still suspicious, Granados went to the Eastern Airlines ticket lift desk and discovered that the tickets used by Szpara and Palazzo had been purchased in numerical sequence. Deducing that the tickets must have been purchased contemporaneously rather than separately as represented, the Marshal concluded that a search of their luggage was essential "for the safety of the flight." After ordering the flight to wait, he went beneath the aircraft and withdrew one of the suitcases that matched a claim number he had recorded during his search of Palazzo. Granados testified that after checking the baggage for wires or other triggering devices, he opened it and immediately ascertained that it contained marijuana. At about 8:45 a.m. Szpara, Palazzo and four suitcases were removed from the aircraft and returned to the terminal.

Szpara claimed two of the four confiscated suitcases. A search made over his objections revealed that they contained no contraband. Palazzo continued to deny that he was traveling with luggage. Granados opened the two bags with tags matching Palazzo's stubs and found them both to contain marijuana. The defendants' requests to contact an attorney were refused. They were detained incommunicado by Customs agents, who had advised them of their constitutional rights, before they were transferred to agents from the Bureau of Narcotics and Dangerous Drugs (BNDD) for questioning.

At 10:30 a.m. Palazzo, who had been given *Miranda* warnings by Granados and the BNDD agents, agreed to cooperate. He stated that the marijuana had been purchased early that morning from an individual named "Rudy" (the defendant Viagran), whose phone number was found on a slip of paper in Palazzo's wallet. After several unsuccessful attempts, Palazzo completed an implicating telephone call to Viagran, which was tape recorded by the agents. ·

The defendants urge this court to reverse their convictions on grounds that the district court erred in admitting the marijuana—because it was the product of a search and seizure that violated their Fourth Amendment rights—and the incriminating statements uttered by Palazzo and Szpara—because they followed denial of their requests for assistance of counsel and the delay of their appearance before a Magistrate, contrary to Fed.R.Crim.P. 5(a). Our judgment that the under-plane luggage

search by Marshal Granados went beyond constitutionally permissible air piracy search limits makes it unnecessary to reach the second contention as to the defendant Palazzo.

This court was first faced with the constitutional propriety of an airport search in United States v. Moreno, 475 F.2d 44 (5th Cir. 1973). Consistent with our Fourth Amendment duty "to strike a cautious balance between the competing interests of law enforcement [in conducting warrantless searches] and the right of the individual to be left alone," 475 F.2d at 49–50, we looked to principles enunciated by the Supreme Court in constitutionally analogous circumstances. The rationales underlying the seminal decisions in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1963), and Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), led us to recognize that "[d]ue to the gravity of the air piracy problem . . . the airport, like the border crossing, is a critical zone in which special Fourth Amendment considerations apply." 475 F.2d at 51 (footnote omitted). We held there that a warrantless search of the defendant, a ticketed passenger who exhibited signs of suspicious activity in the airport lounge and en route to the boarding gate,[1] was constitutionally permissible under a less demanding standard than ordinary probable cause. Similarly, in United States v. Legato, 480 F.2d 408 (5th Cir. 1973), two anonymous bomb threat tips that were corroborated on the scene by the questionable conduct of two suspects were held to supply "reasonable grounds" that constitutionally justified an "intermediate police response" by security personnel.

■ United States v. Skipwith, 482 F.2d 1272 (5th Cir. 1973), upheld an airport search at the boarding gate in a different factual setting. Skipwith had presented himself for boarding, met the F.A.A. anti-skyjack profile, appeared nervous and under the influence of alcohol or some other drug, first stated that he had no identification and then confessed to traveling under a false name, and displayed a bulge in his trouser pocket that proved upon search to be a packet of cocaine rather than the suspected weapon. We held "that those who actually present themselves for boarding on an air carrier, like those seeking entrance into the country, are subject to a search based on mere or unsupported suspicion." 482 F.2d at 1276. When viewed in this light, Marshal Granados' actions in detaining Palazzo and Szpara at the boarding gate on the basis of suspicious actions and in conducting personal searches to which they both consented, were clearly consistent with the constitutional precepts laid down in the prior decisions of this Circuit.

The search of the baggage deposited in the aircraft presents a far different aspect. The government argues that this search was justified by the overwhelming public interest in effective protection against the threat posed by air piracy, the objective facts known to and capable of articulation by Granados at the time, and the fact that the luggage in question had not been examined prior to its stowage on the aircraft.

In *Moreno*, we measured "the constitutionality of the police officer's conduct by the . . . [*Terry*] standard: whether the facts available to the officer at the moment of the seizure or the search would justify a man of reasonable caution in the belief that the action taken was appropriate. 392 U.S. 1, at 22, 88 S.Ct. 1880, 20 L.Ed.2d 889, at 906." 475 F.2d at 47. We further stated that "reasonableness is the ultimate standard by which we must be guided in determining the constitutional propriety of the airport search which resulted in . . . [defendant's] arrest and conviction . . . . Camara v. Munici-

---

1. Moreno appeared extremely nervous, had a bulge in his coat pocket, and lied when confronted by the same Marshal Granados about his destination during a previous taxi trip from the San Antonio airport.

pal Court, 387 U.S. 523, 539, 87 S.Ct. 1727, 1736, 18 L.Ed.2d 930, 941 (1966)." 475 F.2d at 50. The broader boarding gate search of the suspect approved in *Skipwith* was one "with sufficient scope to reveal any object or instrumentality that [the suspected skyjacker] could reasonably have used to effect an act of air piracy." 482 F.2d at 1277.

A closer case on its facts is United States v. Cyzewski, 484 F.2d 509 (5th Cir. 1973), which involved the reasonableness of the retrieval and warrantless search of checked baggage. There we held that "[a]irport security measures are reasonable, therefore, insofar as they permit government agents to determine whether a suspect presents an immediate danger to air commerce. The search may continue until the law enforcement official satisfies himself that no harm would come from the passengers boarding the plane. . . . Only when it becomes unreasonable for the suspect's innocence to be further questioned does the security search itself become unreasonable." 484 F.2d 509 at 513. Cyzewski and his traveling companion, Herbert, were originally pointed out to the marshals as "selectees," persons who conformed to the F.A.A. skyjacker's profile. We sustained the search because "at no point in the authorized security procedure did defendants' innocence become clear to the marshals. To the contrary, Herbert and Cyzewski suspended themselves in a quagmire of suspicion." 484 F.2d at 514. They were initially unable or unwilling to furnish identification and their luggage was removed from the aircraft only after they represented that confirming identification papers lay inside. Subsequently, they voluntarily furnished identification demonstrating that their traveling names were false, admitted fabricating both their identities and nonpossession of identification, and refused to permit inspection of the now-retrieved bags, which had been found to trigger the magnetometer. The luggage was seized and searched only after Herbert had opened it enough

to reach inside and possibly grasp a suspected weapon. .

In an attempt to construct a web of incriminating circumstances in the cause *sub judice* comparable to *Cyzewski*, the government points out that Granados had more than sufficient reason on the basis of personal observation to disbelieve Palazzo's representations at the boarding gate. His denial of any acquaintance with Szpara was belied by the fact that Granados had seen them together on at least three occasions, that both men were traveling to New York on the same flight, and that both had presented New Jersey driver's licenses for identification. Moreover, Palazzo had nervously disavowed any knowledge or ownership of the unidentified bundle and continued to state that he had no luggage after his attempt to hide the baggage claim stubs was exposed during the consensual search of his person. Finally, the "loan-to-a-stranger-for-a-ticket" story was repudiated by the Marshal's reconnoiter of both suspects at the ticket counter when they first arrived at the airport and his discovery that their tickets had been issued in numerical sequence.

■ The search we sanctioned in *Cyzewski* was undertaken "[o]nly after every line of inquiry had failed to eliminate the probability of danger . . . ." 484 F.2d at 515. Whatever degree of suspicion these facts and circumstances would reasonably suggest to an experienced law enforcement officer who viewed them from Granados' perspective, we are convinced that after personal searches failed to uncover any objects, instrumentalities or paraphernalia that could be employed to perpetrate the piracy of an aircraft, no anti-skyjacking necessity remained that would authorize the search of the baggage which had been checked at a remote point and was no longer in the possession or under the control of the suspects. Palazzo and Szpara (1) were never subjects of any pre-flight informant's tip, (2) did not conform to the F.A.A. profile, (3) furnished satisfactory and cor-

rect identification that corresponded to the names under which they were traveling, (4) were subjected to a thorough personal search and (5) failed to "light the magnetometer" immediately before they were finally permitted to board the airliner. At this stage of the approved behavioral profile-magnetometer-interrogation-frisk procedure, the careful and thorough actions of Granados had foreclosed any reasonable probability of danger attendant to permitting Palazzo and Szpara to depart with the aircraft.

■■ Consequently, the removal and subsequent search of defendant's stowed luggage cannot be appraised under airport search standards. Rather, its authentication as an exception to the requirement of a warrant must be founded in probable cause and exigent circumstances. This latter ingredient is wholly lacking. These personal effects had been consigned to the aircraft company for transportation. If Granados thought he could demonstrate probable cause for their search, he should have impounded the baggage and presented his facts to a Magistrate.[2] Of course, the fruits of the illegal search can neither furnish probable cause for arrest and further search,[3] nor be admitted in evidence against Palazzo to establish criminal conduct.

■ Viagran's contention that the physical evidence, Palazzo's incriminating statements and the recorded telephone conversation were inadmissible to prove his guilt, however, rests on different ground. "The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those . . . who are aggrieved solely by the introduction of damaging evidence. Co-conspirators and co-defendants have been accorded no special standing." Alderman v. United States, 394 U.S. 165, 171–172, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969). See Simmons v. United States, 390 U.S. 377, 389–390, 88 S.Ct. 967, 974, 19 L.Ed.2d 1247 (1968). Assuming arguendo that Marshal Granados and the Customs and BNDD agents, in addition to conducting an unlawful search and seizure, also unconstitutionally compromised Palazzo's and Szpara's Sixth Amendment right to assistance of counsel, their Fifth Amendment privilege against self-incrimination, and furthermore impermissibly delayed their appearance before the Magistrate, we are unable to detect any concomitant intrusion upon Viagran's constitutional freedoms. It is true that Viagran was convicted for having possessed this same contraband. However, the period of that possession clearly related to a time prior to his sale of the substance to Palazzo and Szpara. From the moment they entered the airport through the completion of the search and seizure of the suitcases, the contents of the suitcases were never actually or constructively possessed by Viagran. He had received payment in full for the baggage and its illicit content earlier that morning. Palazzo and Szpara were his customers, not his agents. Since Viagran never claimed or proved that he had a property interest in or physical possession of the merchandise at the time of Marshal Granados' actions, and since, the possession

---

2. See United States v. Lonabaugh (5th Cir. 1973) [No. 73–2241, December 17, 1973]; United States v. Garay, 477 F.2d 1306 (5th Cir. 1973).

Whether Marshal Granados thought this luggage presented a danger to the flight of this aircraft or was subject to search for some other reason must be evaluated in light of his conduct in opening a suitcase, which had not been subjected to a magnetometer appraisal or anything other than his view and feel, beneath an airliner full of passengers and crew without evacuating the craft or calling in a bomb disposal squad.

3. "It is axiomatic that an incident search may not precede an arrest and serve as part of its justification." Sibron v. New York, 392 U.S. 40, 63, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968). Cf. Gustafson v. Florida, —— U.S. ——, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973).

948

with which he was charged related solely to a previous time, he lacks any standing to complain of this search and seizure. Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Cf.* United States v. Lonabaugh (5th Cir. 1973) [No. 73–2241, December 17, 1973]. Absent any abridgment of his own constitutional rights, Viagran cannot invoke the Exclusionary Rule or contest the propriety of the airport search,[4] or object to any *Miranda* warning or Rule 5(a) infirmities which might be found in the government's conduct of its interrogation of Palazzo and Szpara.[5] Finally, we reject outright his claims that the tape recording of his telephone conversation with Palazzo, who clearly consented to the surreptitious electronic surveillance by the BNDD agents, was inadmissible as evidence against him for lack of his consent, United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); United States v. Fanning, 477 F.2d 45 (5th Cir. 1973); United States v. Napier, 451 F.2d 552 (5th Cir. 1971), and that the agents infringed Viagran's *Miranda* rights by delaying his arrest in order to secure recordings of the incriminating conversation. United States v. Hoffa, 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374 (1966); Koran v. United States, 469 F.2d 1071 (5th Cir. 1972).

The convictions of Michael Palazzo are

Reversed.

The convictions of Rudolfo Castro Viagran are

Affirmed.

4. United States v. Mendoza, 473 F.2d 692, 695 (5th Cir. 1972); United States v. Solis, 469 F.2d 1113, 1114 n. 1 (5th Cir. 1972), *cert. denied*, 410 U.S. 932, 93 S.Ct. 1375, 35 L.Ed.2d 594 (1973); *see* United States v. Wilson, 488 F.2d 400 (5th Cir. 1973). *But cf.* United States v. Legato, 480 F.2d 408, 410 n.6 (5th Cir. 1973) (dictum).

5. Rogers v. United States, 340 U.S. 367, 371, 71 S.Ct. 438, 441, 95 L.Ed. 344 (1951); United States v. Dowdy, 486 F.2d 1042 (5th Cir. 1973) [1973]; Hall v. United States, 413 F.2d 45, 48 (5th Cir. 1969).