UNITED STATES of America,
Plaintiff-Appellee,

v.

Henry E. HERZBRUN,
Defendant-Appellant.

No. 82–3065.

United States Court of Appeals,
Eleventh Circuit.

Jan. 23, 1984.

Ed Leinster, Orlando, Fla., for defendant-appellant.

Joseph T. Urbaniak, Jr., Robert W. Genzman, Asst. U.S. Attys., Orlando, Fla., for plaintiff-appellee.

Before TJOFLAT, VANCE and CLARK, Circuit Judges.

TJOFLAT, Circuit Judge:

Henry E. Herzbrun appeals his conviction for possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (1976). He contends that the district court erred in denying his pretrial motion to suppress the cocaine. We find no error, and affirm.

I.

This case involves an attempt to smuggle cocaine through an airport security checkpoint onto an airplane. On March 20, 1982, Henry E. Herzbrun entered the Orlando International Airport and purchased a ticket for Delta flight 442 to Philadelphia, departing at 8:25 a.m. He was carrying a leather shoulder bag, with side pouches. To get to his flight, Herzbrun had to go through the security checkpoint on the Delta concourse, which was equipped with an X-ray machine and a magnetometer. Signs posted on the concourse informed passengers that if they passed through the checkpoint they would be subject to a search.

When he reached the checkpoint, Herzbrun placed his shoulder bag on the conveyor belt that fed the X-ray machine and walked through the magnetometer. The magnetometer did not alert, but Amina Buxo, who was operating the X-ray machine, noticed a large, dark, unidentifiable mass in the bottom of Herzbrun's shoulder bag. Buxo informed her co-worker, Rafaela Fonesca, of this fact, and Fonesca also viewed the bag on the X-ray screen.[1] Fonesca's job was to open a bag if the machine disclosed an indistinguishable object, and determine whether the object was harmless. The purpose of the checkpoint was to ensure that no weapons, flammables, or explosives got on board or near an aircraft, and the checkpoint personnel were trained to inspect anything that did not appear to be harmless on the X-ray screen.

Fonesca was not satisfied that the mass in Herzbrun's bag, as it appeared on the X-ray screen, was harmless, so she decided to open the bag. Herzbrun told her that the bag only contained clothes and that he did not want it opened. She replied, "Sir, we have to open if you want to go on the plane." Fonesca then opened the bag and put her hand inside. She felt "something different in the bottom," a mass seemingly covered by a towel. She could tell it was not clothing. At this point Herzbrun said, "Take your hands off. I don't want you to search the bag." Herzbrun then shut the bag on Fonesca's hand. Walter Gallagher, an off-duty deputy sheriff, who happened to be passing through the checkpoint behind Herzbrun, identified himself and asked, "Can I help you, what's the problem?" Herzbrun replied, "There is no problem. I don't want to go on the airplane anyway and can she look in my bag?" Gallagher in turn replied that "If you are going to load on the aircraft, I believe she is required to know what's in the bag." At this point two Orlando police officers, Ken Lloyd and Julian Davis, summoned by Buxo through a silent alarm, arrived on the scene. Herzbrun was arguing with Fonesca. Fonesca

---

1. Between them, Buxo and Fonesca had approximately six and one-half years of experience at the security checkpoint. The women were employed pursuant to security procedures mandated by the Federal Aviation Administration at 14 CFR § 121.538 (rev.1979).

told the officers that there was an unidentifiable mass in the shoulder bag which she needed to examine but that Herzbrun would not permit a search. Officer Lloyd informed Herzbrun that if he planned to board the plane, he would have to allow someone to inspect the bag. Herzbrun, clutching his shoulder bag, replied, "I don't want to fly," and made a hasty retreat toward the nearest exit and taxi stand. Lloyd and Davis followed him. As Herzbrun entered a cab, Lloyd and Davis placed him under arrest. They took him to an office in the terminal, near the baggage area, where he was given *Miranda* warnings, questioned briefly, and released.[2] They kept his shoulder bag, however, and at 10:00 a.m. a detector dog alerted to the presence of narcotics in the bag. The officers then procured a search warrant, searched the bag, and uncovered over one pound of cocaine hydrochloride.

A federal grand jury indicted Herzbrun on March 31, 1982, for possession of cocaine with intent to distribute. Following his arraignment, Herzbrun moved the court to suppress the cocaine on the grounds that it was seized in violation of the fourth amendment. His motion was denied. Herzbrun submitted to a bench trial and was found guilty. He now appeals.

 Herzbrun concedes, at the outset, that if Officers Lloyd and Davis had probable cause to arrest him, their seizure of his shoulder bag was legal. The definition of probable cause is, of course, well established. *See, e.g., United States v. Elsoffer,* 671 F.2d 1294, 1298–99 (11th Cir.1982). Probable cause exists if " 'the facts and circumstances within [the arresting officer's] knowledge and of which [he] had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959) (quot-

ing *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)). *See also e.g., United States v. Preston,* 608 F.2d 626, 632 (5th Cir.1979) *cert. denied,* 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 794 (1980). The arresting officer need not have in hand sufficient evidence to convict, because when assessing probable cause "we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.,* citing *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). In other words, probable cause must not be judged with clinical detachment, but with a common sense view to the realities of normal life. *United States v. Agostino,* 608 F.2d 1035 (5th Cir.1979).

## II.

### A.

This circuit has recognized that airport security checkpoints and loading gates are *sui generis* under the fourth amendment. Due to the intense danger of air piracy, we have long held that these areas, like international borders, are "critical zones" in which special fourth amendment considerations apply. The progenitor of our holdings is *United States v. Skipwith,* 482 F.2d 1272 (5th Cir.1973). In that case the defendant presented himself for boarding at an airport gate. He fit the FAA "skyjacker" profile, was traveling under an alias, and had a visible bulge in his right front trouser pocket about three inches long by two inches thick. Sky marshals ordered him to a private office and searched him. The search uncovered a bag of cocaine in his trouser pocket. We upheld the validity of the search even though it was not based upon probable cause. Noting the "bitter experience" with air piracy, we stated,

---

**2.** Both the Government and Herzbrun agree that this detention, which lasted approximately 50 minutes, constituted a full-scale arrest rather than a limited "stop" under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889

(1968). *See generally United States v. Berry,* 670 F.2d 583 (5th Cir. Unit B 1982) (en banc) (outlining the three levels of police-citizen encounters in airport situations).

Reasonableness requires that the courts must weigh more than the necessity of the search in terms of possible harm to the public. The equation must also take into account the likelihood that the search procedure will be effective in averting the potential harm. On the opposite balance we must evaluate the degree and nature of intrusion.... [In this case] [t]he search procedures have every indicia of being the most efficacious that could be used. The group being screened is limited to persons with the immediate intention of boarding aircraft .... [There is an] almost complete absence of any stigma attached to being subjected to search at a known, designated airport search point ... the person to be searched must voluntarily come to and enter the search area. He has every opportunity to avoid the procedure by not entering the boarding area. Finally, the circumstances under which the airport search is conducted make it much less likely that abuses will occur.... [T]hese searches are made under supervision and not far from the scrutiny of the traveling public. Moreover, the airlines, which have their representatives present, have a definite and substantial interest in assuring that their passengers are not unnecessarily harassed.

*Id.* at 1275–76.

In *Skipwith,* we went on to hold that a search in an airport gate area or security checkpoint did not require probable cause or even reasonable suspicion, but instead "mere suspicion of possible illegal activity." *Id.* at 1276. We noted that this was not a stringent rein on police discretion, but cautioned that "the net can sweep no wider than necessary since the broad right to search is limited to the last possible point in time and space which could protect the aircraft, the boarding gate (or secure corridor entrance)." *Id.* at 1276–77. In *Skipwith* we also dispensed with any notion that a traveler can attempt to enter the secure area and then beat a retreat if the search

proves not to his liking. ' "Such an option would constitute a one-way street for the benefit of a party planning airport mischief, since there is no guarantee that if he were allowed to leave he might not return and be more successful." [3] We noted that an unimpeded exit would diminish the risk to skyjackers and increase attempts. *Id.* at 1281. Established search procedures are more valuable for what they discourage than what they discover, and this court in *Skipwith* saw no constitutional reason to afford a "heads-I-win, tails-you-lose" guarantee to criminals wishing to board aircraft. *Id.*

*Skipwith* thus stands for the proposition that travelers who enter airport security areas may be searched on *mere* suspicion. Moreover, those presenting themselves at a security checkpoint thereby consent automatically to a search, and may not revoke that consent if the authorities elect to conduct a search. *Accord United States v. DeAngelo,* 584 F.2d 46, 48 (4th Cir.1978) *cert. denied,* 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 493 (1979) ("having consented to the search, [the defendant] could not withhold permission after the first step of the process disclosed that he was attempting to carry aboard the aircraft articles that were concealed from X-ray"); *but see United States v. 'Homburg,* 546 F.2d 1350 (9th Cir. 1976) *cert. denied,* 431 U.S. 940, 97 S.Ct. 2654, 53 L.Ed.2d 258 (1977) (*Skipwith* mere suspicion standard rejected; encounter upheld as valid *Terry* stop).

*Skipwith* has spawned a number of cases in this circuit; we discuss only those particularly relevant. In *United States v. Cyzewski,* 484 F.2d 509 (5th Cir.1973) *cert. denied,* 415 U.S. 902, 94 S.Ct. 936, 39 L.Ed.2d 459 (1974), an Eastern Airlines gate attendant considered the defendant a potential skyjacker and so informed two deputy U.S. Marshals. The deputies seized the defendant's luggage, which had been checked, and asked the defendant if they could search it. 1277).

**3.** 482 F.2d at 1281 (Aldrich J., dissenting) (adopted in part by the panel majority, *id.* at

Although the defendant would not consent to a search, he did agree to walk with it through the magnetometer. The magnetometer alerted, and the deputies searched the luggage, uncovering five pounds of marijuana wrapped in a bag. Citing *Skipwith,* we upheld the search though based on mere suspicion, *id.* at 512, and held that "[such a] search may continue until the law enforcement official satisfies himself that no harm would come from the passenger's boarding the plane." *Id.* at 513.

We also reiterated that "[t]his Court has made clear that an investigation need not be curtailed simply because a suspect decides not to take a particular flight.... We have expressly decided to reject the right-to-leave argument...." *Id.* at n. 4 (citations omitted). *Cyzewski* also addressed the question whether the authorities can conduct a security search outside the perimeter of the security area of one who has attempted to enter the security area. We held that "[t]he limits of a constitutional search are not necessarily defined by the perimeter of a particular security system. The marshals' specified authority should not bar further investigation if, in the exercise of their professional judgment, their reasonable suspicions [have] not been allayed by the routine security check." *Id.* at 514. *Accord, United States v. Legato,* 480 F.2d 408 (5th Cir.) *cert. denied,* 414 U.S. 979, 94 S.Ct. 295, 38 L.Ed.2d 223 (1973) (suspects stopped in airport parking lot).

■ We also cautioned in *Cyzewski* that in deciding the lawfulness of a search, a court should focus on the reasonableness of the investigating officer's actions, not on the contraband a search might eventually disclose. 484 F.2d at 515. The inquiry is whether the officer, on the basis of the articulable facts at hand, had reason to suspect that the defendant was carrying materials that could endanger the safety of a flight.

*United States v. Clay,* 638 F.2d 889 (5th Cir. Unit B) *cert. denied,* 451 U.S. 917, 101 S.Ct. 1996, 68 L.Ed.2d 310 (1981), and *United States v. Wehrli,* 637 F.2d 408 (5th Cir. Unit B) *cert. denied,* 452 U.S. 942, 101 S.Ct. 3089, 69 L.Ed.2d 958 (1981), are both strikingly similar to the instant case. In *Clay* the defendant attempted to pass her shoulder bag through the X-ray machine at an airport security gate. The operator observed an unidentifiable dark object on the screen and, with the defendant's permission, started "digging in." 638 F.2d at 891. The operator retrieved a manila envelope from the bag and, without consent, opened it and two more packages inside, finding cocaine. *Id.* We affirmed the defendant's subsequent conviction, holding that "the fact that the x-ray scan machine indicated Clay's shoulder bag contained an unidentifiable dark object created sufficient suspicion to justify a complete physical search of the luggage until the object was positively identified as harmless." *Id.* at 892.

Similarly, in *Wehrli*[4] the X-ray operator spotted what looked like dark cylinders with wiring in the defendant's carry-on luggage. The defendant removed two cloth rolls containing gold chains from the bag and told the operator that this was what she had seen. The operator informed Wehrli that a search having been indicated, the entire bag would have to be searched. As the operator reached inside the bag, Wehrli grabbed her wrist. *Id.* at 408. The operator persisted, Wehrli released his grasp, and the operator pulled a bag of cocaine from his luggage. Citing *Skipwith,* we upheld the search based on mere suspicion.[5]

4. That *Wehrli* is directly on point can be seen by the preamble to the *Wehrli* panel's opinion: "This case presents a single issue: what fourth amendment requirements, if any, circumscribe the search of a passenger's carry-on luggage when he presents himself at a boarding gate to enter an aircraft?" 637 F.2d at 408.

5. We reiterated Judge Friendly's admonition that

[w]hen the risk is the jeopardy to hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane, the danger *alone* meets the test of reasonableness, so long as the search is conducted in good faith for the purpose of preventing hijacking or like damage and with reasonable scope and the passenger has been given advance notice of his

### B.

At the time Officers Lloyd and Davis arrested Herzbrun, they knew that he had presented himself at the airport security checkpoint and had invited, albeit tacitly, Buxo and Fonesca to search him and his shoulder bag. The women proceeded to discover a dark solid mass which, as they testified at the suppression hearing, could have been gun powder, plastic explosives, narcotics, or any number of substances. When they discovered this mass, Herzbrun attempted to withdraw his consent, stating that he had decided not to board his flight, and, after creating a disturbance, hastily departed. Such circumstances are highly probative of probable cause. As we stated in *United States v. Bowles,* 625 F.2d 526, 535 (5th Cir.1980): "Although flight alone will not provide probable cause that a crime is being committed, in appropriate circumstances it can supply the 'key ingredient justifying the decision of a law enforcement officer to take action' .... 'Flight invites pursuit and colors conduct' that might otherwise appear innocent." (citations omitted). *See United States v. Macias,* 546 F.2d 58, 61 (5th Cir.1977) (making a U-turn and driving away from a border checkpoint gets "obvious weight" in assessing probable cause); *United States v. Fontecha,* 576 F.2d 601, 602 (5th Cir.1978) (same; suspect finally arrested four miles from checkpoint after U-turn).[6]

■ Viewing the entire occurrence in a common-sense, pragmatic manner, the arresting police officers in the instant case had probable cause to believe that the substance the two checkpoint inspectors had observed was either narcotics or explosives—it could have been little else. In *Elsoffer, supra,* probable cause to arrest a suspect in an airport hallway (away from the secure gate area) was established solely by the existence of a rectangular bulge shaped like a soft-bound book in the front of the suspect's trousers. 671 F.2d at 1299. A dark unidentifiable mass found in the carry-on luggage of a passenger trying to board an aircraft is at least as ominous and suspicious, especially when the traveler abruptly aborts his travel plans merely because the security inspectors commence to search his bag.

As we stated above, that this case involved an attempted passage through an airport security checkpoint is crucial. Herzbrun's case is on all fours with *Skipwith* and its progeny.[7] The only difference between Herzbrun's case and *Wehrli* is that rather than release the baggage inspector's hand like Wehrli did, Herzbrun shut his bag on the inspector's hand and beat a hasty retreat. *Clay* likewise presents nearly identical facts. Herzbrun did not discuss these cases, much less distinguish them, in his brief to this court.

■ Contrary to Herzbrun's contentions at trial and in this appeal, he had no constitutional right to revoke his consent to a search of his bag once it entered the X-ray machine and he walked through the magnetometer.[8] *Skipwith, Cyzewski, supra.* Herzbrun was subject to a search based on mere suspicion, just as he would have been had he attempted to cross another fourth amendment "critical zone"—an international border. *Skipwith,* 482 F.2d at 1276. *See Clay,* 638 F.2d at 991. Moreover,

---

liability to such a search so that he can avoid it by choosing not to travel by air. 637 F.2d at 410, quoting *United States v. Bell,* 464 F.2d 667, 675 (2d Cir.) *cert. denied,* 409 U.S. 991, 93 S.Ct. 335, 34 L.Ed.2d 258 (1972) (Friendly, J., concurring).

6. *Macias* and *Fontecha* are especially apposite because the fourth amendment standards for airport security checkpoints are no more stringent than those applying to border crossings. *Clay,* 638 F.2d at 891.

7. The district court based its denial of Herzbrun's suppression motion almost exclusively on *Skipwith* and its progeny.

8. We do not concern ourselves in this case with the requisites for a strip search or a body cavity search. Such examinations are significantly more intrusive and could require a heightened degree of suspicion. *See e.g., United States v. Himmelwright,* 551 F.2d 991 (5th Cir.) *cert. denied,* 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977); 3 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment 281–95 (1978 & 1983 Supp.)

his conduct after the search began gave the police officers sufficient cause to detain him as he entered the taxi. That he was able to get to the taxi stand before the police moved in was of no constitutional import. The police were charged with the safety of the air traveling public and with determining that every person and parcel presented for boarding was harmless. *Cyzewski,* 484 F.2d at 514; *Legato,* 480 F.2d 408. Pursuant to this duty, the police "had a legitimate interest in making a conclusive determination with respect to [Herzbrun's] conduct and presence in the airport." *United States v. Moreno,* 475 F.2d 44, 52 (5th Cir.), *cert. denied,* 414 U.S. 840, 94 S.Ct. 94, 38 L.Ed.2d 76 (1973). Otherwise they would have been impeded in their task of deterring, identifying, and investigating those planning mischief aboard airplanes.

Herzbrun's conviction is, accordingly, AFFIRMED.