UNITED STATES of America

v.

Christian HARTWELL.

Criminal Action No. 03–384.

United States District Court, E.D. Pennsylvania.

Dec. 22, 2003.

Albert J. Raman, Lawrence R. Watson, II, Rossman D. Thompson, Defender Association of Philadelphia, Philadelphia, PA, for Defendant.

Peter F. Schenck, Richard P. Barrett, U.S. Attorney's Office, Philadelphia, PA, for Plaintiff.

### ORDER AND MEMORANDUM

DuBOIS, District Judge.

### ORDER

**AND NOW** this 22nd day of December, 2003, upon consideration of defendant Christian Hartwell's Motion to Suppress Physical Evidence and Statements (Document No. 32, filed September 12, 2003), Government's Response to Defendant Christian Hartwell's Motion to Suppress Evidence (Document No. 42, filed October 10, 2003), Defendant Christian Hartwell's Supplemental Memorandum of Law in Support of Motion to Suppress Physical Evidence and Statements (Document No. 47, filed November 26, 2003) and Government's Supplemental Response to Defendant Christian Hartwell's Motion to Suppress Evidence (Document No. 46, filed November 25, 2003) and the related submissions of the parties, following a Hearing and Oral Argument on November 18, 2003, **IT IS ORDERED,** for the reasons set forth in the accompanying Memorandum, that defendant Christian Hartwell's Motion to Suppress Physical Evidence and Statements is **GRANTED IN PART** and **DENIED IN PART,** as follows:

1. That part of the Motion to Suppress which seeks to suppress the drugs seized

from defendant, Christian Hartwell, is **DENIED**;

2. That part of the Motion to Suppress which seeks to suppress the statements of defendant, Christian Hartwell, is **GRANTED**.

### MEMORANDUM

## I. FACTS AND PROCEDURAL HISTORY

Defendant is charged in a two count indictment with violation of 21 U.S.C. § 841 for possession with intent to distribute approximately 375 grams of cocaine and approximately 94 grams of cocaine base ("crack"). The drugs were seized from defendant at the Philadelphia International Airport on Saturday, May 17, 2003, as defendant was passing through a pre-flight security screening checkpoint prior to catching a flight to Phoenix, Arizona. The pre-flight screening required defendant to walk through a magnetometer and to have his carry-on luggage x-rayed. Defendant placed his luggage on the conveyer belt and his bag passed inspection without incident. However, as defendant walked through the magnetometer, the alarm sounded. According to defendant, he was instructed to remove all metal from his person and to pass through the magnetometer a second time. Defendant said he complied with this instruction and sounded the alarm again.[1] Defendant was then taken aside by Transportation Security Administration ("TSA") agent Carlos Padua, and told to empty his pockets of any metal. In response, defendant removed several items from his pockets, including a large amount of cash. Padua

next instructed defendant to put the cash away and proceeded to use the handheld magnetometer, also called a "wand," in an effort to detect what had triggered the walk-through magnetometer. As Padua passed the wand over defendant's body, a solid object was detected in the lower leg pocket of defendant's cargo pants.[2] Padua then asked defendant what was in his pocket.

At this point, the Government's and defendant's accounts of the events diverge. According to the defendant, after the wand alarmed and he failed to respond to Padua's inquiry regarding the object in his pocket, he was taken by Padua and another TSA agent, Leroy Kane, into a private screening room located approximately 40–60 feet away from the checkpoint area. Defendant testified that he did not request the private screening. Once in the screening room, defendant states that Padua asked him three times to remove the object from his pocket, but he was "noncompliant." (Transcript of November 18, 2003 Hearing on Motion to Suppress ("Tr.") at 127–28). As a result, defendant said Padua became frustrated, reached into defendant's pocket, and pulled out a package of drugs. At that point, either Padua or Kane summoned Philadelphia Police Officer Gerald Golden, who came into the room and asked defendant what was in the package. Defendant replied "foot powder." Tr. at 113. According to defendant, Officer Golden then searched defendant, retrieving two additional packages of drugs and over $3000 in cash. Officer Golden immediately called for back up, and after several officers responded,

---

1. Government witnesses testified that Defendant only triggered the magnetometer once. This discrepancy, however, is not material to the Court's decision.

2. Defendant testified that when the handheld wand encountered the object, the wand alarmed. Agent Padua testified that the wand did not alarm, but merely struck the object in defendant's pocket as the wand was swept down defendant's leg. This discrepancy in the testimony is not material to the Court's decision.

defendant was placed in handcuffs and formally arrested. Defendant testified that he was never read his *Miranda* rights while at the airport.

The Government presented a different account of what took place after Padua detected the object in defendant's pocket. According to Padua, defendant requested the private screening, which TSA agents have a policy of honoring. Padua further testified that once he and defendant reached the screening· room, Padua asked defendant several times to remove the item from his pocket, but defendant did not comply. Defendant became visibly nervous at the requests and started backing away. Padua also testified that at about the same time, defendant dropped his pants. Because of defendant's suspicious behavior, Padua told Kane to notify the Supervisor who, in turn, summoned Officer Golden. According to Padua, after Officer Golden arrived and asked what defendant had in his pocket, defendant pulled out the first package of drugs himself. Padua denies ever reaching into defendant's pocket. Padua also testified that at some point, defendant feigned falling and dropped a second package of drugs, which was later retrieved by Officer Golden, behind a table. Padua said the third package of drugs was recovered from defendant in a search by Officer Golden.

Officer Golden's testimony confirms Padua's account, except that, according to Golden, all three packages were produced by defendant. The first package was thrown under the table, the second package fell out of defendant's pocket when he dropped his pants, and the third package was handed to Golden by defendant when Golden asked him what he had in his pock-

et. Golden denies removing a package of drugs from defendant's pocket.

After defendant was arrested, he was transported to the airport police headquarters where the airport police decided to refer him to the Federal Drug Enforcement Administration Task Force ("DEA"). Philadelphia Police Officer James Corbett and Pennsylvania State Trooper Joseph Nigro, working as DEA Task Force Officers, arrived at airport police headquarters at approximately 11:30 a.m., four and a half hours after defendant was initially arrested. Corbett and Nigro took defendant into custody and transported him to DEA headquarters at the Federal Building in Philadelphia, stopping at the DEA sub-office en route.[3] Defendant was placed in the DEA lockup. Shortly thereafter, he was moved by Corbett and Nigro to an interview room for interrogation. According to Corbett, defendant was Mirandized prior to being interviewed and thereafter stated he understood he had a right to an attorney but wanted to explain to the agents why he decided to get involved with drugs. Defendant then told the agents that he had borrowed $21,000 from a man in Arizona and had come up with the idea of buying drugs in Philadelphia for use in repaying the debt.

Defendant testified, in contrast, that he requested an attorney shortly after being placed in the interrogation room:

I had told Officer Corbett at the time when we came in the room, the first thing I remember they asked well, do you want to help yourself. And would you consider—before even being read my *Miranda* rights, they asked me would you be willing to wear a wire or consider, you know, wanting to help us

---

3. On cross-examination, both .Corbett and Nigro denied stopping anywhere en route to transporting defendant to the Federal Building. However, while conferencing during a

Court recess, Corbett and Nigro recalled that they had stopped at the DEA sub-office for a period of 10–15 minutes prior to bringing defendant to the federal building.

out or you're facing a mandatory minimum ten years. And some other things. And I said, well, I really would like to speak to an attorney. Officer Corbett said I would not be—you won't be able to get an attorney until sometime next week. I said I really would like to speak to one. He said we wouldn't be able to get you one until next week. Tr. at 120. Defendant was questioned further on this subject by the Court in the following exchange:

Court: Now you testified that you were taken to a floor in the Federal Building and placed in a room, you called it a conference room. I think the police officers described it as a witness room. But in any event, when you were there, you said you were read your *Miranda* rights, is that correct?

Defendant: I was placed in a cell.

Court: And then put in a conference room?

Defendant: Yes, sir.

Court: And you were read your *Miranda* rights in the conference room?

Defendant: Interview room, yes, sir.

Court: And you didn't make any statement to the police before you were read your *Miranda* rights, is that correct?

Defendant: Not that I recall, no, sir, Your Honor.

Court: When they read your *Miranda* rights and you said they told you that you could have a lawyer, but they said that they couldn't get a lawyer for you until Monday. At that time, did you decide that you would talk to the police and give them a statement?

Defendant: Well, I asked them first that I wanted to speak to an attorney. And he advised me that he couldn't—they couldn't get one for me for that interview or anything.

Court: On Saturday?

Defendant: Yes, Sir.

Court: But you were told in that same interview that you didn't have to talk to the police without an attorney, is that right?

Defendant: That is correct, yes, sir.

Court: And they said they could get you an attorney either on Monday or next week, is that right?

Defendant: They just said we—he said we wouldn't be able to get you one until next week. He didn't specify a day or time, he just said next week.

Court: And then when you heard that, you decided to go ahead and speak to the police about whatever they were going to ask you?

Defendant: Yes, he asked me a few questions and I just answered, yes, sir.

Tr. at 133–35.

On cross examination, when questioned about whether defendant had requested an attorney, Corbett stated the following:

Attorney: After you read Mr. Hartwell his *Miranda* rights, isn't it correct, sir, that Mr. Hartwell asked for an attorney.

Corbett: No. He stated that he knew he had the right to talk to an attorney, but that he wanted to explain to us why he got involved in this.

Attorney: Isn't it correct that you advised Mr. Hartwell that if he was going to speak to an attorney that an attorney would not be provided until the next week?

Corbett: [Lengthy pause] I know it wouldn't have been a week. I mean we could have gotten him a lawyer probably the very next day, once he was in custody. So, no, it would not have been like a week.

Attorney: Well, I didn't say in a week, the next week, that would have been perhaps Monday or Tuesday.

Corbett: Well, I advised him an attorney would be appointed for him on Monday when he appeared before the Judge. You know, that if he couldn't afford a lawyer that one would be appointed for him by the Court. And that he could talk to the attorney and, you know, we could further work things out if he wanted to cooperate.
Tr. at 91.

## II. DISCUSSION

### A. *Physical Evidence*

Since the Federal Aviation Administration (now TSA) began requiring magnetometer screenings of all passengers and the search of all carry-on items in January 1973, courts have uniformly recognized an exception to the warrant requirement for an airport checkpoint search. However, no consensus has been reached as to the grounds justifying such a search. Several courts have evaluated the search under the Fourth Amendment's " 'general proscription against unreasonable searches and seizures ... since as a practical matter, an airport search could not be subjected to the warrant requirement.' " *See, e.g., U.S. v. Albarado,* 495 F.2d 799, 804 (2d Cir. 1974) (citations omitted). Other courts have held that airport searches constitute consensual administrative searches, a framework that includes an analysis of implied consent as one factor of reasonableness under the fourth amendment. *See, e.g., U.S. v. Davis,* 482 F.2d 893 (1973). Because implied consent and reasonableness under the Fourth Amendment constitute independent grounds for upholding a warrantless search, this Court will analyze the issues separately.

#### 1. *Reasonableness Under the Fourth Amendment*

Courts analyzing airport checkpoint searches under the Fourth Amendment's generalized proscription against unreasonable searches have considered the following factors in determining reasonableness: "public necessity, efficacy of the search, and degree of intrusion." *U.S. v. Skipwith,* 482 F.2d 1272, 1275 (5th Cir.1973); *see also, U.S. v. Albarado,* 495 F.2d 799, 805 (2d Cir.1974)(considering need for the search, "inefficiency" of search, and intrusion on privacy interests); *U.S. v. Herzbrun,* 723 F.2d 773, 775 (11th Cir.1984)(embracing tripartite analysis set forth in *Skipwith* ).

Little controversy exists regarding the first two factors, public necessity and efficacy of the search. The need to deter and prevent airplane hijacking is "unquestionably grave and urgent," *U.S. v. Davis,* 482 F.2d, 893, 910 (9th Cir.1973), and most courts recognize that the search procedures mandated by the TSA, including the magnetometer screening of all passengers and the screening of all carry-on luggage "have every indicia of being the most efficacious that could be used." *U.S. v. Skipwith,* 482 F.2d at 1275. Courts, however, have taken somewhat different approaches in analyzing the third factor, the degree of intrusion.

The *Skipwith* court analyzed the entire checkpoint search, including the use of "metal detectors, visual inspection, [and] the rare but potential physical searches" as a single search under the Fourth Amendment, noting that a number of conditions particular to a pre-flight checkpoint search render it less intrusive then a search in a different context. The Court stated:

[There is almost] a complete absence of any stigma attached to being subjected to a search at a known, designated airport search point. As one commentator has put it in the border search context, "individuals searched because of their membership in a morally neutral class have less cause to fell insulted ..." In addition, the offensiveness of the screen-

ing process is somewhat mitigated by the fact that the person to be searched must voluntarily come to and enter the search area. He has every opportunity to avoid the procedure by not entering the boarding area. Finally, the circumstances under which the airport search is conducted make it much less likely that abuses will occur. Unlike searches conducted on dark and lonely streets at night where often the officer and the subject are the only witnesses, these searches are made under supervision and not far from the scrutiny of the traveling public. Moreover, the airlines, which have their representatives present, have a definite and substantial interest in assuring that their passengers are not unnecessarily harassed. The officers conducting the search under these circumstances are much more likely to be solicitous of the Fourth Amendment rights of the traveling public than in more isolated, unsupervised surroundings.

*Id.* at 1275–76 (citations omitted). Weighing these factors, the *Skipwith* court held that the search of a passenger who actually presents himself for boarding may be based upon mere or unsupported suspicion, i.e., without weighing the particularized facts of each case, and even when the passenger is frisked without first activating a magnetometer.

In contrast, the court in *U.S. v. Albarado*, 495 F.2d at 805–06, analyzed the magnetometer screening and the pat-down/frisk as separate searches. Like the court in *Skipwith,* the *Albarado* court upheld the screening by the magnetometer as reasonable under the Fourth Amendment based upon generalized factors applicable to all passengers, focusing particularly on the de minimis degree of intrusion resulting from a magnetometer screening. While the *Albarado* court also recognized generalized factors of a checkpoint frisk that make it less intrusive than a frisk in a different context, that court held nonetheless that a routine frisk conducted after a single triggering of a walk-through magnetometer was unreasonable under the Fourth Amendment. *Id.* at 808. Instead, the *Albarado* court ruled that even at a pre-boarding checkpoint, the government must use the least intrusive means available to resolve a single alarm, and proposed several options including a second screening by a magnetometer or wand, conducted after instructing the passenger to remove all metal objects. Only if the machine activated a second time would the *Albarado* court permit a pat-down or frisk as the only remaining practical measure available. *Id.*

 The Court concludes that the search conducted in this case meets the standards set forth in *Skipwith* and in *Albarado* and thus it need not decide whether a frisk conducted at an airport screening checkpoint is per se reasonable under the Fourth Amendment. This Court also need not decide whether to credit defendant's testimony that a frisk even occurred. Whether defendant voluntarily produced the drugs or whether defendant was frisked, the search was reasonable under the Fourth Amendment. First, the search of defendant is per se reasonable under *Skipwith* because of generalized factors applicable to all passengers at an airport checkpoint. Second, the facts of this case also warrant upholding the search under the stricter standard of *Albarado*. The record is clear that the Government used the least intrusive means reasonably available to resolve the alarm. There is no dispute that defendant triggered the magnetometer at least once and that Padua attempted to resolve the alarm through the use of the wand. In fact, according to defendant, he passed through and triggered the walk-through magnetometer two separate times, after

which he was wanded by agent Padua, triggering the alarm a third time. Further, defendant does not dispute that he was instructed to remove all metal objects from his person prior to each screening and that he was specifically requested to remove the items in his lower pocket several times. Given these facts, it is immaterial under *Albarado* whether the defendant complied with the government's demand to produce the drugs or whether defendant was frisked by agent Padua. The Government had exhausted all purely voluntary means of resolving the alarm and was thus justified under the Fourth Amendment in taking either course of action.

■ The Court also rejects the defendant's argument that after he triggered the magnetometer, he should have been given the option of leaving the checkpoint area without submitting to a more intensive secondary search if he agreed not to board the aircraft. In advancing this argument, the defendant relies upon the holdings in *U.S. v. Davis*, 482 F.2d 893 (9th Cir.1973), and *Torbet v. United Airlines, Inc.*, 298 F.3d 1087 (9th Cir.2002). However, these cases do not support defendant's position. While *Davis* held that "airport screening searches are valid only if they recognize the right of a person to avoid search by electing not to board the aircraft," the court did not specify at what point a passenger may exercise this right. The Ninth Circuit subsequently explained the *Davis* holding, stating that

> *Davis* does not specifically hold that consent to an additional search could be withdrawn after an inconclusive x-ray can if the passenger agreed not to board the plan. While *Davis* implies that a passenger may withhold such consent by electing not to fly, Davis did not determine at what point in the boarding process a passenger may decided not to fly and thereby withdraw his consent ... A rule allowing a passenger to leave with-

out a search after an inconclusive x-ray scan would encourage airline terrorism by providing a secure exit where detection was threatened. Also, an airport screening agent has a duty to ferret out firearms and explosive devices carried by passengers. This duty could not be fulfilled if the agent was prohibited from conducting a visual inspection and limited hand search after an inconclusive x-ray scan. Thus, if a potential passenger chooses to avoid a search, he must elect not to fly *before placing his baggage on the x-ray machine's conveyer belt.*

*U.S. v. Pulido–Baquerizo*, 800 F.2d 899, 902 (9th Cir.1986)(emphasis added). *Torbet* also states "to avoid search, a passenger must elect not to fly *before placing his bag on the x-ray belt.*" 298 F.3d 1087, 1089 (9th Cir.2002)(emphasis added). These cases are thus inapposite because defendant placed his carry-on luggage on the x-ray belt and proceeded through the magnetometer, at which point defendant relinquished any right he might have had under *Davis* to avoid a secondary search.

To the extent that *U.S. v. Miner*, 484 F.2d 1075 (9th Cir.1973), also cited by the defendant, stands for a broader interpretation of *Davis*, the decision has been limited by the more recent decisions in *U.S. v. Pulido–Baquerizo*, 800 F.2d at 902 and *Torbet v. United Airlines, Inc.*, 298 F.3d at 1089. Another case cited by defendant, *U.S. v. Lopez*, 328 F.Supp., 1077 (E.D.N.Y. 1971), is inapposite as it does not even address the right to leave argument. The last case cited by the defendant on this issue, *U.S. v. Albarado*, 495 F.2d 799, 807 (2d Cir.1974), did not specifically hold that a prospective passenger must be given a right to withdraw at any time in order for a search to be reasonable under the Fourth Amendment.

Moreover, insofar as any of the cases cited by defendant can be interpreted to

support a broad right to leave the airport checkpoint after triggering an alarm, this Court rejects such authority, noting that more recent and compelling decisions have held that the Fourth Amendment does not require that a traveler "be given a safe exit once detection is threatened." *Torbet v. United Airlines,* 298 F.3d 1087, 1090 (9th Cir.2002); *see also U.S. v. Herzbrun,* 723 F.2d 773, 776 (11th Cir.1984)(rejecting the notion that a "traveler can attempt to enter the secure area and then beat a retreat if the search proves not to his liking"). These decisions have recognized that the Government's interest in deterring hijacking is undermined by providing potential hijackers a safe exit should their attempts to bypass security measures fail. As stated in *Herzbrun,* a broad right to leave

> would constitute a one-way street for the benefit of a party planning airport mischief, since there is no guarantee that if he were allowed to leave he might not return and be more successful ... Established search procedures are more valuable for what they discourage than what they discover, and this court in *Skipwith* saw no constitutional reason to afford a 'heads-I-win, tails-you-lose' guarantee to criminals wishing to board aircraft.

*Id.* (citing *U.S. v. Skipwith,* 482 F.2d 1272,- 1281 (5th Cir.1973)). *See also U.S. v. DeAngelo,* 584 F.2d 46, 48 (4th Cir.1978); *U.S. v. Meulener,* 351 F.Supp. 1284 (C.D.Cal.1972); *People v. Heimel,* 812 P.2d 1177, 1181–82 (Colo.1991).

■ For all the foregoing reasons, this Court holds that the Fourth Amendment does not require TSA agents to give a prospective passenger who has triggered an alarm the option of avoiding a secondary search by choosing not to fly. TSA agents have a responsibility to ensure the safety of all passengers and to maintain the integrity of the sterile area, which

cannot be accomplished unless all alarms triggered at the checkpoint are resolved prior to permitting a passenger to leave the secure area.

#### 2. *Implied Consent*

■ This Court also holds that by submitting to the screening process, defendant impliedly consented to the search and was lawfully required to complete the search to determine the cause of the alarm. *See, e.g., U.S. v. Pulido–Baquerizo,* 800 F.2d 899, 901–02 (9th Cir.1986); *U.S. v. Herzbrun,* 723 F.2d 773, 776 (11th Cir.1984). The record shows that defendant was on notice that prior to boarding his flight he would have to pass through the magnetometer and submit his carry-on luggage to an x-ray examination. Defendant had flown before and had submitted to such searches in the past. Indeed, after the events of September 11, 2001, any claims by defendant that he did not know of the screening requirements would be implausible. Such screening measures are not only expected by the public, they are demanded as a necessary measure of ensuring passenger safety. Given this widespread knowledge of airport screening requirements, the Court concludes that a passenger impliedly consents to a search when, as in this case, he places his handheld luggage on the x-ray belt and walks through a magnetometer, and that once this procedure begins, the passenger cannot thereafter revoke his consent.

### B. *Statements*

#### 1. *Foot Powder Statement*

Defendant argues that he made the "foot powder" statement to the Philadelphia police without being appraised of his *Miranda* rights, and that the statements should therefore be suppressed. In response, the Government argues that the "foot-powder" statement was made at a

time when defendant was not yet in custody and that *Miranda* warnings were therefore not required. In support of this position, the Government compares routine questioning of a prospective passenger while going through an airport security checkpoint to routine questioning in the border context, where *Miranda* warnings are not required. *U.S. v. Vigil–Montanel,* 753 F.2d 996 (11th Cir.1985). In its Supplemental Response, the Government also argues that defendant was not formally arrested until after the statement was made, and that *Miranda* warnings were therefore not required.

■ The Court recognizes that, as in the border context, advising all prospective passengers of their *Miranda* rights whenever routine questions are asked at an airport security checkpoint would be thoroughly impractical and would distort the purpose of *Miranda. See, e.g., U.S. v. McCain,* 556 F.2d 253, 255 (5th Cir.1977). For that reason, the Court concludes that routine questioning of passengers at airport security checkpoints does not amount to custodial interrogation. However, even in the border context, *Miranda* warnings are required where the search or detention of the passenger becomes more than routine. *See, e.g., U.S. v. Salinas,* 439 F.2d 376, 380 (5th Cir.1971). As stated in *Salinas,*

> Thousands of persons enter the country daily and are subject to some degree of detention while their luggage is searched and they are asked routine questions concerning citizenship, destination, whether they have items to declare, questions regarding contraband and the like. To hold that questions of these types or routine border searches of luggage place a person "in custody" within the meaning of *Miranda* would unduly distort that case. However, when the border search or detention becomes more than routine, *such as*
> *when a person is discovered to be concealing suspicious materials,* or when a person is taken to a private room and strip searched, as here, a different outcome obtains.

*Id.* (emphasis added). Applying that rationale, the *Salinas* court held that if defendant was questioned while he was in a strip search room, the interrogation violated *Miranda* and the defendant was entitled to a new trial. *See also U.S. v. Moody,* 649 F.2d 124, 127–28 (2d Cir.1981) (holding that questioning conducted after suspicious materials were found on defendant in a private room at border checkpoint was a custodial interrogation requiring imposition of *Miranda* warnings).

■ Following *Salinas,* this Court concludes that the interrogation of defendant at the airport was not merely routine. The Government repeatedly emphasized defendant's suspicious behavior in the screening room, including refusing to show Padua the items in his pockets, backing away from Padua and acting nervous, dropping his pants unbidden, and tossing an unidentified object behind a table. Thus, before the drugs were even produced, the eye of suspicion was clearly focused on defendant. Moreover, once defendant actually produced the first package containing a white block-like object, which Officer Golden testified that he saw clearly and recognized as crack cocaine, it is clear under *Salinas* that any questioning was not merely routine. Because the "foot powder" statement was made thereafter and before defendant was Mirandized, the Court concludes that the statement is inadmissable.

■ The Court also rejects the Government's fall back argument that the interrogation was non-custodial. Defendant was in a small private room, surrounded by two TSA agents and a police officer blocking the exit, and had just produced a

suspicious item that he had been exceedingly reluctant to reveal. No reasonable person in these circumstances would have felt free to leave at such a time. Defendant's freedom was thus "curtailed to a degree associated with formal arrest," requiring that he be Mirandized before interrogation occur. *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). The fact that defendant was not formally arrested until after he made the statement is inapposite. The touchstone of *Miranda* is that the defendant be in custody, not that he be formally arrested. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Thus, the Court concludes that the interrogation of defendant at the airport violated *Miranda* and that the foot powder statement must be suppressed.

2. *Statements to DEA Task Force Officers*

Defendant argues that the statements made in DEA custody should be suppressed because the statements were made in response to questions posed after defendant invoked his Fifth Amendment right to an attorney.[4] In response, the Government contends that defendant's testimony is not credible and that he in fact never requested an attorney. The Government argues, in the alternative, that if the Court finds that the defendant requested an attorney, the request was only equivocal, entitling the agents to continue the interrogation under *Davis v. U.S.,* 512 U.S. 452, 454, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). Finally, the Government takes the position that even if defendant unequivocally requested an attorney, the statements are nonetheless admissible because defendant himself made the decision to continue the interrogation.

The Government's arguments would be much stronger had Corbett not corroborated defendant's testimony by admitting that he told defendant an attorney could not be appointed until the following week. In its Supplemental Response, the Government suggests two possible explanations for Corbett giving this advice: that Corbett offered the information unsolicited as part of, or directly after, the *Miranda* recitation, or that the advice was offered in response to a question from defendant as to *when* an attorney could be appointed. The Court concludes that neither of these explanations is credible. On direct examination, Corbett read from a card the *Miranda* warnings he gave defendant, which did not include advise regarding when an attorney could be appointed, and then testified that defendant responded by stating "he knew he had the right to talk to an attorney, but he just wanted to explain to us why he got involved in this." Tr. at 79. Only when cross-examined did Corbett admit to telling defendant that an attorney could not be appointed until the following week. However, Corbett never explained what precipitated this conversation. Instead, Corbett steadfastly maintained that defendant responded to the *Miranda* warnings by stating that "he knew he had a right to talk to an attorney, but that he wanted to explain to us why he got involved with this." Tr. at 91. This account simply does not explain how or why a conversation regarding appointment of an attorney took place. In light of this unexplained conflict, and taking into consideration Corbett's considerable hesitation in testifying on this issue, the Court rejects the Government's contentions that the defendant never requested an attorney, or that he only asked when an attorney would

4. Defendant also argued that the statements should be suppressed as fruits of an illegal arrest and a prior illegal interrogation. Because the invocation of the right to an attor-

ney is dispositive of whether the statements are suppressed, the Court does not address these alternative grounds for suppression.

be appointed, and credits the defendant's testimony that he told the agents that he "really wanted to speak to an attorney." (Tr. at 120).[5] The Court further concludes that this statement was a clear and unequivocal request for an attorney.

 Once it has been determined that a defendant has invoked the right to have counsel present during custodial interrogation, he cannot be questioned further unless (1) he initiates the conversation and (2) he knowingly and intelligently waives his right to have counsel present. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). If the interrogation continues without the presence of an attorney and a statement is taken, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (citing *Escobedo v. Illinois*, 378 U.S. 478, 490, n. 14, 84 S.Ct. 1758, 12 L.Ed.2d 977). Moreover, it is impermissible to use an accused's "subsequent responses to cast doubt on the adequacy of the initial request." *Smith v. Illinois*, 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984).

The Government contends that the requirements of *Edwards* are met in the instant case because the defendant *decided* to continue talking to the agents. The Government also argues that there is no evidence that the agents coerced or badgered the defendant into making incriminating statements. Finally, the Government argues that the defendant's invocation of his right to counsel is invalid because he did not specify that he wanted legal assistance for the purposes of interrogation rather than for different proceedings, such as arraignment.

 The Court rejects each of the Government's arguments. First, there is no requirement that the defendant specify that he wants an attorney for purposes of the interrogation. In *Smith v. Illinois*, the Court held that defendant invoked her Fifth Amendment right when she stated "I want to do that" in response to being informed of her right to counsel. 469 U.S. at 93, 105 S.Ct. 490. Second, the absence of coercion or badgering in a subsequent interrogation is not sufficient to meet the *Edwards* test. The case law is clear that "once a suspect asserts the right, not only must the current interrogation cease, but he may not be approached for further interrogation 'until counsel has been made available to him,'" *McNeil v. Wisconsin*, 501 U.S. 171, 176–177, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (quoting *Edwards*, 451 U.S. at 484–485, 101 S.Ct. 1880). "If the police do subsequently initiate an encounter in the absence of counsel ... the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." *McNeil*, 501 U.S. at 176–77, 111 S.Ct. 2204. This presumption is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494

**5.** Given the Court's finding, the cases cited by the Government, *Flamer v. State of Delaware*, 68 F.3d 710 (3d Cir.1995) and *U.S. v. Doe*, 170 F.3d 1162, 1166 (9th Cir.1999) are inapposite. First, unlike *Flamer*, where the court found that the defendant did not request an attorney, this Court finds under all the evidence that defendant did request an attorney. Second, the *Doe* court's conclusion that the question "what time will I see a lawyer?" was only an equivocal request for an attorney has no bearing on this case because defendant's statement in this case—"I would really like to speak to an attorney"—is an unequivocal request for an attorney. Tr. at 120.

U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990).

■■■■■ There is no evidence in this case that the interrogation ceased as required by *Edwards* and its progeny. Corbett and Nigro never left the interrogation room or placed the defendant back in his cell. According to defendant, the agents simply continued asking him questions. This is clearly prohibited by *Edwards.* Further, the Government has presented no evidence demonstrating that defendant knowingly and intelligently waived his Fifth Amendment right. The case law is clear that a valid waiver "cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation," which is the most that the Government can demonstrate in this case. *Edwards,* 451 U.S. at 484, 101 S.Ct. 1880. Accordingly, the Court concludes that the continued interrogation of defendant after he invoked his Fifth Amendment right to counsel violated *Edwards,* and that the Government has failed to demonstrate that defendant knowingly and intelligently waived this right. The defendants' statements to Corbett and Nigro must therefore be suppressed.

## III. CONCLUSION

For the foregoing reasons, the Court will grant defendant's Motion to Suppress to the extent that it seeks to exclude defendant's statements, and deny the Motion with respect to the physical evidence.