

Villanova University School of Law Digital Repository

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-31-2006

# USA v. Hartwell

Precedential or Non-Precedential: Precedential

Docket No. 04-3841

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

## Recommended Citation

"USA v. Hartwell" (2006). *2006 Decisions.* Paper 1656.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1656

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 04-3841

UNITED STATES

v.

CHRISTIAN HARTWELL,

Appellant

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

(Dist. Ct. No. 03-CR-00384)
District Court Judge: Hon. Jan E. DuBois

Argued: May 24, 2005

Before: SCIRICA, Chief Judge, ALITO and
RENDELL, Circuit Judges

(Opinion Filed: January 31, 2006)

Albert J. Raman (argued)
913 Public Ledger Bldg.
Sixth and Chestnut Streets
Philadelphia, PA 19106
*Counsel for Appellant*

Patrick L. Meehan
Laurie Magid
Robert A. Zauzmer
John N. Joseph (argued)
United States Attorney's Office
615 Chestnut St., Suite 1250
Philadelphia, PA 19106

*Counsel for Appellees*

---

OPINION OF THE COURT

---

ALITO, <u>Circuit Judge</u>

Christian Hartwell set off a metal detector at a security checkpoint in an airport. Transportation Security Administration ("TSA") agents then used a magnetic wand to pinpoint any metal on his person. They detected something in Hartwell's pocket and asked to see it. Ultimately, they discovered that the object was crack cocaine and placed Hartwell under arrest. Hartwell argues that the drugs should have been suppressed because the search offended the Fourth Amendment.[1] We hold that it did not.

I.

---

[1]Hartwell also appeals the District Court's decision that he was not eligible for a safety valve departure at sentencing. We reject this claim because Hartwell waived his right to appeal the issue, and he said he understood the waiver at his plea colloquy. <u>Cf.</u> <u>United States v. Khattak</u>, 273 F.3d 557, 561 (3d Cir. 2001) ("If done knowingly and voluntarily, a statutorily created right to appeal is generally held to be waiveable.").

2

Hartwell arrived at the Philadelphia International Airport on Saturday, May 17, 2003, intending to catch a flight to Phoenix. He reached the security checkpoint, placed his hand luggage on a conveyor belt to be x-rayed, and approached the metal detector. Hartwell's luggage was scanned without incident, but he set off the magnetometer when he walked through. He was told to remove all items from his pockets and try again. Hartwell removed several items—including a large quantity of cash—from his pocket, and passed through again.

Transportation Security Administration agent Carlos Padua took Hartwell aside after he passed through the metal detector a second time.[2] Padua used a handheld wand-like magnetometer to discover what set off the metal detector. The wand revealed a solid object in Hartwell's cargo pants pocket.[3] Padua asked what it was, but Hartwell did not respond.

What occurred next is the subject of some dispute. Hartwell claims that he was escorted to a private screening room near the checkpoint, where he refused Padua's repeated requests to reveal the contents of his pocket. Frustrated by Hartwell's unresponsiveness, Padua eventually reached into Hartwell's pocket and pulled out a package of drugs. He immediately called the Philadelphia police, who searched Hartwell, found two additional packages of drugs and about $3000 in cash, and promptly arrested him.

The government claims that neither Padua nor the police officer ever reached into Hartwell's pocket without his consent. According to Agent Padua, the following occurred. After

---

[2]The parties disagree about what happened as Hartwell passed through. The government claims that he did not set off the alarm, while Hartwell says that he did.

[3]The parties also disagree as to how the wand detected the item. Hartwell says that the wand beeped as it passed over his pocket. Agent Padua avers that the wand did not beep, but that it accidentally bumped into a solid object as it passed by Hartwell's pocket.

requesting private screening, Hartwell refused several requests to empty his pocket, nervously backed away from Agent Padua while he was being questioned, and suddenly dropped his pants. This suspicious behavior prompted Padua to call for backup. A police officer arrived and asked Hartwell to remove any items from his pocket, and Hartwell complied by handing over one package of drugs. He then feigned falling to the floor and dropped a second package of drugs.

The District Court found it unnecessary to resolve these conflicting accounts, finding that the search was justified based on undisputed facts. In particular, the Court observed that "[t]here is no dispute that defendant triggered the magnetometer at least once and that Padua attempted to resolve the alarm through the use of the wand." United States v. Hartwell, 296 F. Supp. 2d 596, 603–04 (E.D. Pa. 2003). The Court also noted that Hartwell "does not dispute that he was instructed to remove all metal objects from his person prior to each screening and that he was specifically requested to remove the items in his lower pocket several times." Id. at 604. In the District Court's view, these circumstances justified the officers' behavior, regardless of whose version of the rest of the story was true. "Whether defendant voluntarily produced the drugs or whether defendant was frisked," the Court stated, "the search was reasonable under the Fourth Amendment." Id. at 603.

Although the District Court had no difficulty reaching this result, it recognized that courts have not settled on a single framework for analyzing warrantless searches at airport checkpoints. The Court therefore considered three separate justifications for Hartwell's search, and found each sufficient. The Court first held that the search passed muster under the Fourth Amendment's "general proscription against unreasonable searches and seizures." Id. at 602 (quoting United States v. Albarado, 495 F.2d 799, 804 (2d Cir. 1974)). See also United States v. Lopez, 328 F. Supp. 1077 (E.D.N.Y. 1971). The Court next sustained the search under the theory that it was a "consensual administrative search[]." Hartwell, 296 F. Supp. 2d at 602 (citing United States v. Davis, 482 F.2d 893 (9th Cir. 1973)). Finally, the Court stated that "by submitting to the screening process, defendant impliedly consented to the search and was lawfully required to complete the

4

search to determine the cause of the alarm." Hartwell, 296 F. Supp. 2d at 605. On appeal, Hartwell argues that all three rationales are unfounded. We disagree.

## II.

We hold that the search was permissible under the administrative search doctrine. Cf. United States v. Marquez, 410 F.3d 612, 616 (9th Cir. 2005) ("Airport screenings of passengers and their baggage constitute administrative searches and are subject to the limitations of the Fourth Amendment."). Finding this rationale sufficient, we deem it unnecessary to evaluate the District Court's alternative holdings on generalized reasonableness and implied consent.

> The Fourth Amendment provides:
> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath oraffirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV. This provision limits government action in two ways. First, it requires that searches and seizures be reasonable, and second, it states that when a warrant is required—in circumstances not explicitly defined by the text— it must have certain characteristics. See California v. Acevedo, 500 U.S. 565, 581 (1991) (Scalia, J., concurring).

The Supreme Court has read the Amendment's twin commands in tandem, holding that when people have a reasonable expectation of privacy in their persons or effects, all searches and seizures must be supported by a warrant, unless they fall into one of the exceptions to that requirement. See Minnesota v. Dickerson, 508 U.S. 366, 372–73 (1993) ("Time and again, this Court has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." (internal quotation marks and citations omitted)).

5

The first step in Fourth Amendment analysis is to identify whether a search or seizure has taken place. The Government concedes that an airport pre-boarding security screening is a search. See Br. at 19 (citing United States v. Davis, 482 F.2d 893, 904 (9th Cir. 1973)).[4] But this concession obscures the difficult issue of whether Hartwell experienced one prolonged search, or several individual searches. The District Court considered this question and found authority on both sides. Cases like United States v. Skipwith, 482 F.2d 1272, 1275–76 (5th Cir. 1973), appear to analyze an entire checkpoint search, including "[m]etal detectors, visual inspection, and rare but potential physical searches," as a single search. By contrast, cases like United States v. Albarado, 495 F.2d 799, 805, 807 (2d Cir. 1974), treat a magnetometer screening and a "frisk" as two separate searches. The District Court concluded that the procedure would be permissible under either view, and therefore did not decide which mode of analysis was appropriate. We will employ Skipwith's method of analyzing Hartwell's entire experience as a single search under the administrative search doctrine, and—finding this approach sufficient to resolve the case—do not pass judgment on the Albarado approach.

Thus, we find that Hartwell experienced a single, warrantless search, which was initiated without individualized suspicion. Since it was not conducted pursuant to a warrant, the search must be grounded in an exception to the warrant requirement.

III.

---

[4]See also Katz v. United States, 389 U.S. 347, 353 (1967) (electronic eavesdropping on a conversation in a phone booth is a search because "the Fourth Amendment protects people—and not simply 'areas'"); Kyllo v. United States, 533 U.S. 27, 33 (2001) ("a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable"); United States v. Martinez-Fuerte, 428 U.S. 543, 556 (1976) ("checkpoint stops are 'seizures' within the meaning of the Fourth Amendment").

6

Hartwell's search at the airport checkpoint was justified by the administrative search doctrine.[5] "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing. While such suspicion is not an 'irreducible' component of reasonableness, [the Supreme Court has] recognized only limited circumstances in which the usual rule does not apply." City of Indianapolis v. Edmond, 531 U.S. 32, 37 (2000) (citations omitted). These circumstances typically involve administrative searches of "closely regulated" businesses,[6] other so-called "special needs" cases,[7] and suspicionless "checkpoint" searches.

---

[5]While the Supreme Court has not directly spoken on airport administrative searches, it has discussed them in dicta in two cases. In Chandler v. Miller, 520 U.S. 305, 323 (1997), the Court mentioned that blanket suspicionless searches "may rank as 'reasonable'—for example, searches now routine at airports." And in City of Indianapolis v. Edmond, 531 U.S. 32, 47–48 (2000), it stated that "[o]ur holding also does not affect the validity of border searches or searches at places like airports and government buildings, where the need for such measures to ensure public safety can be particularly acute."

[6]These searches are permissible without a warrant when: 1) a substantial government interest informs the regulatory scheme under which the search is made; 2) the search is necessary to further the regulatory scheme; and 3) the statute's inspection program is a "constitutionally adequate substitute for a warrant." New York v. Burger, 482 U.S. 691, 702–04 (1987) (warrantless administrative inspection of premises of closely regulated business) (citing Donovan v. Dewey, 452 U.S. 594, 600–04 (1981) and United States v. Biswell, 406 U.S. 311, 315 (1972)). See also Michigan v. Tyler, 436 U.S. 499, 507–12 (1978) (administrative inspection of fire-damaged premises to determine cause of the fire); Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523, 534–39 (1967) (administrative inspection to ensure compliance with city housing code is acceptable).

[7]These cases involve situations where "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." New Jersey v. T.L.O., 469 U.S. 325, 351 (1985) (Blackmun, J., concurring). They

7

Suspicionless checkpoint searches are permissible under the Fourth Amendment when a court finds a favorable balance between "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." Illinois v. Lidster, 540 U.S. 419, 427 (2004) (quoting Brown v. Texas, 443 U.S. 47, 51 (1979)) (internal quotations omitted).[8]

Michigan Dept. of State Police v. Sitz, 496 U.S. 444 (1990), provides an illustrative example of a permissible suspicionless checkpoint procedure. In that case, Michigan established a sobriety checkpoint along a state road, stopping every vehicle that passed by in order to question the driver and look for signs of intoxication. If the police observed indicia of impairment, they would pull drivers aside to conduct additional tests. Applying the Brown balancing test, the Court found the system permissible because "the balance of the State's interest in preventing drunken

---

involve contexts such as schools, see Bd. of Educ. v. Earls, 536 U.S. 822, 829–30 (2002); Veronia Sch. Dist. 47J v. Acton, 515 U.S. 646, 653 (1995), employment, Treasury employees v. Von Rabb, 489 U.S. 656 (1989); Skinner v. Railway Labor Executives' Assn., 489 U.S. 602 (1989); O'Connor v. Ortega, 480 U.S. 709 (1987), and probation, Griffin v. Wisconsin, 483 U.S. 868, 873–74 (1987). See also Ferguson v. City of Charleston, 532 U.S. 67, 74 n.7 (2001) (explaining the origin of the special needs doctrine).

[8]See, e.g., Lidster, 540 U.S. at 426–27 (2004) (checkpoint stop to find information about a "hit and run" one week before on the same road is permissible); Edmond, 531 U.S. at 44 (checkpoints aimed at finding drug offenders in order to advance an interest "ultimately indistinguishable" from a general interest in crime control, are impermissible); Michigan Dept. of State Police v. Sitz, 496 U.S. 444 (1990) (sobriety checkpoint aimed to catch drunk drivers is acceptable); Delaware v. Prouse, 440 U.S. 648, 663 (1979) (discretionary, suspicionless stop for a spot check of a motorist's driver's license and registration is illegal); United States v. Martinez-Fuerte, 428 U.S. 543, 546–47 (1976) (border checkpoint to search for illegal aliens 100 miles from the border is legal).

8

driving, the extent to which this system can reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped, weighs in favor of the state program." Sitz, 496 U.S. at 455. As to the State's interest, the Court wrote that "[n]o one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it." Id. at 451. The stop was deemed effective because some quantum of evidence showed that it furthered the purpose for which it was created. "Conversely," the Court stated, "the weight bearing on the other scale—the measure of the intrusion on motorists stopped briefly at sobriety checkpoints—is slight," because the stop lasted for only a short time and the investigation was of minimal intensity. Id.

In this case, the airport checkpoint passes the Brown test. First, there can be no doubt that preventing terrorist attacks on airplanes is of paramount importance. See United States v. Marquez, 410 F.3d 612, 618 (9th Cir. 2005) ("It is hard to overestimate the need to search air travelers for weapons and explosives before they are allowed to board the aircraft. As illustrated over the last three decades, the potential damage and destruction from air terrorism is horrifically enormous."); United States v. Yang, 286 F.3d 940, 944 n.1 (7th Cir. 2002) ("the events of September 11, 2001, only emphasize the heightened need to conduct searches at this nation's international airports"); Singleton v. Comm'r of Internal Revenue, 606 F.2d 50, 52 (3d Cir. 1979) ("The government unquestionably has the most compelling reasons[—]the safety of hundreds of lives and millions of dollars worth of private property[—]for subjecting airline passengers to a search for weapons or explosives that could be used to hijack an airplane.").

Second, airport checkpoints also "advance[] the public interest," as Brown requires.[9] As this Court has held, "absent a

---

[9]Sitz makes clear that "[t]his passage from Brown was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger." Sitz, 496 U.S. at 453. The "effectiveness" prong

search, there is no effective means of detecting which airline passengers are reasonably likely to hijack an airplane." Singleton, 606 F.2d at 52. See also Marquez, 410 F.3d at 616 ("Little can be done to balk the malefactor after weapons or explosives are successfully smuggled aboard, and as yet there is no foolproof method of confining the search to the few who are potential hijackers." (internal quotation marks, brackets, and citation omitted)); United States v. Skipwith, 482 F.2d 1272, 1275 (5th Cir. 1973) (procedures requiring the screening of all passengers and luggage "have every indicia of being the most efficacious that could be used"). Additionally, it is apparent that airport checkpoints have been effective.

Third, the procedures involved in Hartwell's search were minimally intrusive.[10] They were well-tailored to protect personal privacy, escalating in invasiveness only after a lower level of screening disclosed a reason to conduct a more probing search. The search began when Hartwell simply passed through a magnetometer and had his bag x-rayed, two screenings that involved no physical touching. See United States v. Slocum, 464 F.2d 1180, 1182 (3d Cir. 1972) (an airport magnetometer screen "per se is justified"). Only after Hartwell set off the metal detector was he screened with a wand—yet another less intrusive substitute for a physical pat-down. And only after the wand detected something solid on his person, and after repeated requests that he

_____

does not require a "searching examination." Id. at 454. "[F]or purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers." Id. at 453–54.

[10]We do not purport to set the outer limits of intrusiveness in the airport context. Nor do we devise any bright-line test to implement the Brown standard in all future cases. Cf. Marquez, 410 F.3d at 617 (approving a random airport screening because it "was no more extensive or intensive than necessary in order to detect weapons and explosives"). We merely hold that Hartwell's search was "minimally intrusive" under Brown.

produce the item, did the TSA agents (according to Hartwell) reach into his pocket.

In addition to being tailored to protect personal privacy, other factors make airport screening procedures minimally intrusive in comparison to other kinds of searches. Since every air passenger is subjected to a search, there is virtually no "stigma attached to being subjected to search at a known, designated airport search point." See United States v. Skipwith, 482 F.2d 1272, 1275 (5th Cir. 1973). Moreover, the possibility for abuse is minimized by the public nature of the search. "Unlike searches conducted on dark and lonely streets at night where often the officer and the subject are the only witnesses, these searches are made under supervision and not far from the scrutiny of the traveling public." Id. at 1276. And the airlines themselves have a strong interest in protecting passengers from unnecessary annoyance and harassment. See id.

Lastly, the entire procedure is rendered less offensive—if not less intrusive— because air passengers are on notice that they will be searched.[11] Cf. Singleton, 606 F.2d at 52 (approving a

---

[11]Some courts, including the District Court in this case, have approved airport searches on consent-based rationales. See, e.g., United States v. Henry, 615 F.2d 1223, 1230–31(9th Cir. 1980); United States v. Edwards, 498 F.2d 496, 500–01 (2d Cir. 1974); United States v. Mather, 465 F.2d 1035, 1036 (5th Cir. 1972). Other courts, however, remain skeptical. See, e.g., United States v. Albarado, 495 F.2d 799, 806–07 (2d Cir. 1974); United States v. Kroll, 481 F.2d 884, 886 (8th Cir. 1973). See also Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 10.6(g) at 307–09 (4th ed. 2004) (explaining that consent theories are "basically unsound" in the airport context because screening systems rarely meet the requirements for express consent under Schneckloth v. Bustamonte, 412 U.S. 218, 222, 228 (1973), and an implied consent analysis merely "diverts attention from the more fundamental question of whether the nature of the regulation undertaken by the government is in fact reasonable under the Fourth Amendment"). We find it unnecessary to reach this issue because we sustain the screening procedure under the

11

search where passengers "were given advance notice that the search was to be conducted, and could elect not to be searched by deciding not to board the aircraft"). Air passengers choose to fly, and screening procedures of this kind have existed in every airport in the country since at least 1974. The events of September 11, 2001, have only increased their prominence in the public's consciousness. It is inconceivable that Hartwell was unaware that he had to be searched before he could board a plane. Indeed, he admitted that he had previously been searched before flying. Hartwell, 296 F. Supp. 2d at 605. Cf. United States v. Pulido-Baquerizo, 800 F.2d 899, 901 (9th Cir. 1986) ("in light of the circumstances surrounding today's airport checkpoints," travelers who put their belongings on a conveyor belt "impliedly consent to a visual inspection and limited hand search of their luggage if the x-ray scan is inconclusive").[12]

In conclusion, Hartwell's search does not offend the Fourth Amendment even though it was initiated without individualized suspicion and was conducted without a warrant. It is permissible under the administrative search doctrine because the State has an overwhelming interest in preserving air travel safety, and the procedure is tailored to advance that interest while proving to be

administrative search doctrine.

[12]Hartwell argues that once the TSA agents identified the object in his pocket and he refused to reveal it, he should have had the right to leave rather than empty his pockets. We reject this theory. As several courts have noted, a right to leave once screening procedures begin "would constitute a one-way street for the benefit of a party planning airport mischief," United States v. Herzbrun, 723 F.2d 773, 776 (11th Cir. 1984) (internal quotation marks and citation omitted), and "would 'encourage airline terrorism by providing a secure exit where detection was threatened,'" People v. Heimel, 812 P.2d 1177, 1182 (Colo. 1991) (quoting Pulido-Baquerizo, 800 F.2d at 902). See also Torbet v. United Airlines, Inc., 298 F.3d 1087, 1089 (9th Cir. 2002) ("To avoid search, a passenger must elect not to fly before placing his bag on the x-ray belt." (citation omitted)).

only minimally invasive, as that term is understood in <u>Brown</u>.[13]

---

[13]Even assuming that the sole purpose of the checkpoint was to search only for weapons or explosives, the fruits of the search need not be suppressed so long as the search itself was permissible. <u>See</u> <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 377 (1993) ("The seizure of an item whose identity is already known occasions no further invasion of privacy.") (collecting cases); <u>United States v. Edwards</u>, 498 F.2d 496, 500 (2d Cir. 1974) ("unless and until there should be evidence of abuse, we hold to the traditional rule that if the search is proper, it is of no moment that the object found was not what the officer was looking for") (citation omitted). Since the object in Hartwell's pocket could have been a small knife or bit of plastic explosives, the TSA agents were justified in examining it. <u>See also</u> <u>Marquez</u>, 410 F.3d at 617 ("The screening at issue here is not unreasonable simply because it revealed that Marquez was carrying cocaine rather than C-4 explosives.").