EMAS, J.
The State appeals from an order granting M.R.’s motion to suppress statements *274 made by M.R and a motion to suppress physical evidence seized from M.R. For the reasons that follow, we affirm in part and reverse in part.

FACTS

M.R. was charged in a petition for delinquency with possession with intent to sell, manufacture, or deliver cannabis within 1000 feet of a school, in violation of section 893.13(l)(c)(2), Florida Statutes (2011). M.R. filed a motion to suppress physical evidence (marijuana seized from him following his arrest) and a motion to suppress two post-arrest statements. The trial court conducted an evidentiary hearing at which two police officers testified and provided the following testimony:[1]
Officer James is an officer with the City of Miami Police Department, assigned to the Problem Solving Team in the Liberty City area. Officer James has four years of experience in narcotics investigation. Over the last four years Officer James has made “well over” one hundred narcotics-related arrests; between twenty and thirty of those arrests were for sale of narcotics.
On May 12, 2011, Officer James was conducting a surveillance of a specific duplex within Liberty City. The duplex was located approximately three houses away from a high school and directly next to a park. Officer James testified that his team responds often to this area within Liberty City and that there are “a lot of drug sales and drug transactions going on in this area of Liberty City in particular.” Officer James conducted the surveillance on this day and at this location because the owner of the duplex, who happened to be a City of Hialeah police officer, had received multiple calls from residents that narcotics were being sold in front of the duplex.[2] Officer James conducted his surveillance from an undercover vehicle parked about fifty feet across the street from the duplex.
During his surveillance, Officer James observed M.R. making what looked like “several narcotic transactions, hand-to-hand transactions with several males[,]” approximately fifty feet away from him. Officer James observed “at least six or seven” transactions during the course of his surveillance. On each of those occasions, an individual came up to and shook hands with M.R., giving M.R. an unknown amount of U.S. currency. In each instance, M.R. handed a “baggie” back to the individual. Officer James could not see what was inside the baggie. These transactions occurred out in the open, and M.R. appeared to make no attempt to hide his actions.
Officer James testified that, based upon the circumstances and his training and experience, what he observed were narcotics transactions. The police did not speak with, search or arrest any of the six or seven individuals involved in the observed transactions. Based on these observations, Officer James radioed Officer Crock-er and directed her to arrest M.R. Officer Crocker arrived moments later, arrested M.R., and searched him. Officer Crocker found eight individually packaged baggies of marijuana inside the seam of the gym *275 shorts M.R. was wearing.[3] Officer Crock-er handcuffed M.R. and placed him in the back of her patrol car, but at no point did she (or any officer on the scene) read M.R. his Miranda[4] rights. While M.R. was handcuffed and seated in the patrol car, Officer Crocker said to M.R.: “You don’t have to be out here doing this,” to which M.R. responded that he was selling marijuana to support his infant child. Officer Crocker then asked for M.R.’s mother’s name and phone number. Officer Crocker called M.R.’s mother and requested she come to the scene. Officer Crocker did not offer a reason for calling M.R.’s mother and asking her to come to the scene. There is nothing in the record to indicate that M.R. requested to speak with his mother or to have her come to the location of his arrest. When M.R.’s mother arrived, she walked over to M.R., who remained handcuffed and seated in the police vehicle. M.R. said to his mother (with Officer Crocker still present) that he did not want to talk to his mother in front of the officer and that she (his mother) knew why he was selling marijuana. No evidence was introduced to establish how much time passed between the first and second statements made by M.R.
At the conclusion of the hearing, the trial court suppressed the marijuana because Officer James did not have probable cause for the arrest, relying upon Ray v. State, 40 So.3d 95 (Fla. 4th DCA 2010).
The trial court also suppressed both statements of M.R. The court found that at the time of the statements, M.R. was in custody, had not been read his Miranda rights, and that he made the first statement in response to Officer Crocker’s statement to him. The court found Officer Crocker’s statement was the functional equivalent of interrogation, as it was reasonably likely to elicit an incriminating response. The court found that because M.R. was subjected to custodial interrogation without having been advised of his Miranda rights, both statements were obtained in violation of M.R.’s constitutional rights. The State appeals the court’s order.[5]
In reviewing a trial court’s ruling on a motion to suppress, appellate courts defer to the trial court’s findings of fact so long as they are supported by competent, substantial evidence. We review de novo the legal question of whether there was probable cause under the totality of the factual circumstances. State v. Hankerson, 65 So.3d 502 (Fla.2011).

ANALYSIS

1. Probable Cause for Arrest
The first issue is whether the officers had probable cause to arrest M.R., *276 since the marijuana was discovered by police as a result of a search made incident to M.R.’s arrest. The Supreme Court of Florida has stated that “a probable cause determination generally is so multi-faceted that one determination will seldom be a useful precedent for another[.]” Hankerson, 65 So.3d at 506. Nonetheless, some of the factors to be evaluated in determining whether probable cause exists in connection with a drug surveillance operation include the following:
(a) whether the officer can see either drugs or money being transferred;
(b) the officer’s narcotics experience;
(c) the reputation of the location for drug transactions;
(d) the extent of the period of surveillance; and
(e) the history of previous multiple arrests from that site.
Ray, 40 So.3d at 97. An analysis of the Ray factors as applied to the facts in this case establishes that the police had probable cause to arrest M.R. and conduct a search of M.R. incident to that arrest.
a. Drugs or money being transferred
Officer James’ testimony established that he saw M.R. shake hands with at least six or seven individuals, and that each of these individuals gave M.R. money. Although Officer James did not actually see drugs change hands,[6] he did observe M.R. hand each of these individuals a baggie in exchange for the money. M.R. cites State v. Caicedo, 622 So.2d 149, 150-51 (Fla. 3d DCA 1993) for the proposition that “the mere observation of a money transaction, or an officer’s bare suspicion of drug activity, are insufficient to create probable cause.” While we agree with such a proposition, it hardly describes the events which unfolded in this case. Here, the officer did not merely observe a money transaction, but rather six or seven transactions, each of which involved an exchange of money for a small baggie containing something.
b. The officer’s narcotics experience
Moreover, Officer James provided his observations and assessments based upon his law enforcement experience of four years in narcotics investigation, well over a hundred narcotics arrests, with approximately 20-30 of them related to sales.[7] Officer James’ observations, together with his experience in narcotics investigation, *277 led him to conclude that M.R. was engaged in narcotics transactions.
c. Reputation of the location for drug transactions
In explaining its reasons for granting the motion to suppress, the trial court found that “the record is devoid of any testimony about the reputation of the area for drug transactions, the extent of Officer James’ period of surveillance, as well as the history of previous multiple arrests from that site.” While the trial court was correct that there was no evidence regarding “history of previous multiple arrests from that site,” the record in fact established that there was evidence regarding the reputation of the area for drug transactions. As to this factor, Officer James testified that there are “a lot of drug sales and drug transactions going on in this area of Liberty City in particular.” Additionally, Officer James testified he initiated the surveillance at this location because the owner of the duplex had received multiple calls from residents that narcotics were being sold in front of the duplex. The trial court failed to consider this unrebutted testimony as part of the totality of the circumstances in determining probable cause. This was error.
d. The extent of the period of the surveillance
Finally, the court noted that there was no evidence regarding “the extent of Officer James’ period of surveillance.” This is only partially accurate and, more importantly, overlooks one of the more significant circumstances in this case. While there was no testimony regarding “the period of surveillance,” there was certainly testimony regarding the extent of the surveillance. Officer James did not observe merely a single transaction, but rather a series of at least six or seven identical transactions with different individuals, each involving a hand-to-hand exchange of money for a baggie containing something. While the record does not establish how long it took for all six or seven of these transactions to occur, no one can reasonably doubt that a series of six or seven transactions has greater evidentiary significance than observing a single transaction. Thus, while the time period of the surveillance was never established, the actual observations made over the course of the surveillance — i.e., the six or seven individual transactions observed by Officer James — provided relevant and significant evidence of the extent of the surveillance conducted and must be considered in evaluating the totality of the circumstances.[8],[9]
We note that a determination of probable cause does not require the officer on the street or the judge in court to abandon all notions of common sense or to mechanically apply a reality-defying test. The assessment of probable cause involves *278 application of “practical, common-sense judgment.” Illinois v. Gates, 462 U.S. 213, 244, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Probable cause is a “fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules.” Id. at 232. “[A] police officer may draw inferences based on his own experience in deciding whether probable cause exists.” Ornelas v. United States, 517 U.S. 690, 700, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). We must keep in mind that the standard of probable cause is “only the probability, and not a prima facie showing, of criminal activity.” Hankerson, 65 So.3d at 506 (citing Gates, 462 U.S. at 235, 103 S.Ct. 2317). As the Eleventh Circuit observed in United States v. Herzbrun, 723 F.2d 773, 775 (11th Cir. 1984):
The arresting officer need not have in hand sufficient evidence to convict, because when assessing probable cause “we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.” Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). In other words, probable cause must not be judged with clinical detachment, but with a common sense view to the realities of normal life.
While the fact-intensive nature of these cases often prevents direct comparison, many of the facts in the instant case resemble Hankerson. In Hankerson, officers conducted a surveillance of a residence based upon information from neighborhood residents and confidential informants that drug transactions were taking place at that location. The officer observed the defendant drive up to the residence, exit his car, and approach a group of three people on the front porch. While looking up and down the street, the defendant opened his hand and each of the individuals took something from the defendant’s hand and each quickly gave the defendant money in return. The defendant then returned to his car and drove away. The officer could not see what the defendant had been holding in his hand.
The officer had witnessed hundreds of drug transactions during his eleven years’ experience in a street-level narcotics unit. The officer believed, based upon his experience, that he had observed an illegal narcotics transaction take place. He radioed to other officers, who stopped the defendant’s vehicle and searched the defendant, leading to the discovery of small baggies of cocaine.
The trial court denied the motion to suppress and the Fourth District reversed. Hankerson v. State, 32 So.3d 175 (Fla. 4th DCA 2010). The Supreme Court quashed the decision of the Fourth District, holding that, under the totality of the circumstances, the officers had probable cause to believe the defendant was engaged in a narcotics transaction. While Hankerson includes some factors not present in the instant case (a defendant looking up and down the street in an apparent effort to conceal the transactions; a police officer with experience in a street-level narcotics unit), the instant case likewise includes factors not present in Hankerson (the exchange of money for something contained in a baggie; six or seven separate but identical transactions).
The Hankerson court also cited to Revels v. State, 666 So.2d 213 (Fla. 2d DCA 1995). In Revels, officers conducted surveillance of a home which had been the site of numerous narcotics arrests for transactions occurring at the house. Within a few minutes, the officers observed two transac *279 tions in which an individual arrived by car and pulled up to the curb in front of the house. A man sitting outside the house approached the car each time, and each time the officers observed a hand-to-hand transaction in which currency was exchanged for an unidentified object. Less than ten minutes later, officers observed Revels arrive at the location riding a bicycle. The man outside the house approached Revels, who had money in his right hand. Revels gave the money to the man, who placed a small object in Revels’ left hand. Revels then placed his left hand in his jacket pocket and rode away. While the officers could not identify the small object, one of the officers testified that the overall transaction was similar to numerous other cocaine transactions he had witnessed as an experienced narcotics officer. Officers radioed another officer to stop Revels and search his jacket pocket. The search revealed crack cocaine.
The Second District affirmed the trial court’s determination that probable cause existed, concluding that the totality of the circumstances would cause a reasonable person to believe that they observed a drug offense being committed by the defendant. The court noted two significant factors: the exchange of money (for something) and the observation of two similar hand-to-hand transactions immediately pri- or to the transaction involving Revels.
Those two factors are present here, and are even more persuasive than those in Revels: here, the officer observed at least six or seven (not three) hand-to-hand transactions. Moreover, each transaction involved an exchange of cash for a baggie containing an unidentified object (not simply an exchange of cash for an unidentified object).
The Hankerson Court also cited to Knox v. State, 689 So.2d 1224 (Fla. 5th DCA 1997). In Knox, two officers were assigned to conduct surveillance in the vicinity of a store where there had been numerous complaints of drug dealing. One of the officers had “received training in identification of narcotics and had made several dozen narcotics arrests.” Id. at 1225. The officers conducted surveillance for two hours, during which they observed vehicles pull up to the business. The defendant would approach, lean into the vehicle, and pass something to the occupants. As the vehicle pulled away, the officers would see the defendant with cash in his hand. The item the defendant exchanged for cash was concealed from the officers’ view. The Fifth District held that these observations “established sufficient probable cause for an experienced narcotics officer to believe that Knox was engaged in criminal conduct....” Id. We will not belabor the point that the relevant circumstances presented in our case are significantly more compelling than those described in Knox.
Based upon the totality of the circumstances, and consonant with the Ray factors and the analysis in Hankerson, Revels and Knox, we hold in the instant case that there was probable cause to believe that M.R. was engaged in illegal narcotics transactions. The arrest and subsequent search of M.R. was valid, and the trial court’s finding to the contrary was erroneous.
2. Suppression of the Second Statement
The first statement was suppressed because M.R. made it after his arrest, he was never read his Miranda rights, and the trial court determined Officer Crock-er’s statement was the functional equivalent of interrogation as it was reasonably likely to elicit an incriminating response. The State does not seek review of the suppression of this first statement. The *280 State does seek review of the subsequent statement, which the trial court suppressed as an exploitation of the initial illegal custodial interrogation.
After M.R. made this first statement, Officer Crocker obtained the phone number for M.R.’s mother, called her, and asked her to come to the scene. There is nothing in the record to suggest that this was done at M.R.’s request, and Officer Crocker offered no explanation as to why she asked M.R.’s mother to come to the scene.
M.R.’s mother arrived and went to see her son, who was sitting, handcuffed, in the back of the police car and in the custody and presence of Officer Crocker. It was at this point that M.R. said to his mother that he did not want to talk to her in front of the officer and that she (his mother) knew why he was selling marijuana. The State contends that the trial court erred in suppressing this second statement, arguing that M.R.’s statement was not the product of police interrogation, but instead was made voluntarily (though in the presence of police). Alternatively, the State argues there was sufficient attenuation between the two statements to dissipate the taint of the initial illegal custodial interrogation. For these arguments the State relies principally on Mesa v. State, 673 So.2d 51 (Fla. 3d DCA 1996) and Lundberg v. State, 918 So.2d 444 (Fla. 4th DCA 2006). These cases are distinguishable.
In Mesa, the defendant had given a formal confession to police after invoking his right to counsel. The State conceded the police violated Mesa’s Miranda rights by continuing to question him in the absence of counsel, and did not contest the trial court’s suppression of this confession. Following the formal confession, however, and while being transported to a holding cell, Mesa asked the detective if he could speak with his “partner” (a co-defendant named Tapia who had been arrested at the same time). The detective allowed Mesa and Tapia to speak with each other, at which time Mesa made an oral statement that was overheard by the detective. Mesa sought to suppress this second statement and this Court affirmed the lower court’s denial of the motion:
[T]he defendant clearly initiated the conversation ] of which he complains. First, the defendant asked to see his partner, Tapia. This request was not at the suggestion of the detective; this was solely the defendant’s idea. Although the police may have known that there was a possibility that the defendant would incriminate himself when he spoke with Tapia, it was the defendant who requested to see Tapia and any police action was minimal....
Mesa, 673 So.2d at 55.
In Lundberg, the defendant gave an initial statement to police which the trial court later suppressed as having been coerced. Lundberg also sought to suppress a subsequent conversation he had with his girlfriend in the police interview room after police had finished their interrogation. The police were not in the room but recorded the conversation between Lund-berg and his girlfriend. The trial court denied this motion and, on appeal, Lund-berg argued the police obtained these statements through an exploitation of the initial illegality. The Fourth District affirmed, finding no coercion or exploitation, as it was Lundberg himself who asked that his girlfriend be brought to see him, and he voluntarily spoke to her. Lundberg, 918 So.2d at 445.[10]
*281 Notably, in each of those cases it was the defendant who requested to speak with the third person. In the instant case, it was Officer Crocker, not M.R., who called M.R.’s mother to have her come to the scene. There is no evidence that M.R. made any such request. When M.R.’s mother arrived, Officer Crocker brought the mother to M.R., who remained handcuffed in the police car and in the custody and immediate presence of Officer Crock-er. It was at this point M.R. told his mother that he did not want to talk in the officer’s presence, and then told his mother that she (M.R.’s mother) knew why he was selling marijuana.
We affirm the trial court’s determination that these statements by M.R. were an exploitation of the initial illegality.[11]

CONCLUSION

We reverse that portion of the order suppressing the physical evidence. We affirm in all other respects the trial court’s order and remand for proceedings consistent with this opinion.

. Officer James and Officer Crocker were the only two witnesses who testified at the hearing. M.R. did not testify or present any evidence or call any witnesses.

. M.R. argues this was not a formal, planned surveillance focused on a particular individual. Instead, he asserts, it was a spontaneous narcotics surveillance. However, the record reflects that Officer James responded to this specific location and established a surveillance of this specific duplex in response to complaints made by residents to the duplex owner that narcotics were being sold in front of the duplex.

. Officer Crocker found no money on M.R. at the time of his arrest. However, after Officer James radioed Officer Crocker, M.R. went inside the duplex and remained there for several minutes, during which time he was out of the sight of Officer James. When M.R. exited the duplex, he was arrested.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The State does not appeal that portion of the court’s order which suppressed M.R.’s initial statement to Officer Crocker (i.e., in response to the officer’s statement "You don’t have to be out here doing this,” M.R. stated that he was selling marijuana to support his infant child). The State does not contest the trial court’s conclusion that Officer Crocker’s statement was the functional equivalent of interrogation, reasonably likely to elicit an incriminating response. See Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The State does appeal the suppression of the statement M.R. subsequently made to his mother, in Officer Crock-er’s presence (i.e., telling his mother that she knew why he was selling marijuana). The State contends this statement was not the result of an exploitation of the improper custodial interrogation, or was sufficiently attenuated from the taint of the initial improper custodial interrogation.

. Of course, neither Ray nor any other case requires that the officer observe an exchange of both drugs and money. See Ray, 40 So.3d at 97 (factors include "whether the officer can see either drugs or money being transferred accord Santiago v. State, 941 So.2d 1277, 1279 (Fla. 4th DCA 2006); Benemerito v. State, 29 So.3d 367 (Fla. 4th DCA 2010) (officers did not observe drugs or money change hands); Burnette v. State, 658 So.2d 1170 (Fla. 2d DCA 1995). In fact, probable cause may exist, based upon other circumstances and factors, even where the officer observes neither drugs nor money exchanged. See e.g., Williams v. State, 717 So.2d 1109 (Fla. 5th DCA 1998).

. M.R. asserts that Officer James' experience should not be considered because he was not part of a specialized drug unit and never received formal training in narcotics surveillance. However, M.R. cites no case for this proposition. The experience factor in Ray does not require formal training or assignment to a specialized drug unit (though certainly such formal training and experience could add to the weight accorded an officer's testimony). See also § 90.702, Fla. Stat. (2011) (providing "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion; however, the opinion is admissible only if it can be applied to evidence at trial.'').
More to the point, the trial court in its order acknowledged Officer James’ prior narcotics experience, and made no finding that such experience was inadequate or would not be considered. Under the totality of the cir *277 cumstances standard, Officer James’ four years of experience in narcotics investigation and hundreds of narcotics arrests, including twenty to thirty for sale of narcotics, certainly qualifies as the type of "narcotics experience” sufficient for the trial court to permit him to testify to his observations and conclusions.

. The court in Ray did not attempt to establish an exhaustive list of factors to be considered in determining probable cause in the context of a drug surveillance. The number of similar or identical transactions occurring over the course of such a surveillance is a demonstrably relevant factor in a probable cause determination. See Hankerson, 65 So.3d at 507 (noting evidence that surveillance officer "observed a series of quick exchanges with three separate individuals, not a single transaction" was a significant factor in determining the existence of probable cause).

. As indicated earlier, no evidence was presented as to the final Ray factor (history of previous multiple arrests from that site).

. The State also cites Janjua v. State, 688 So.2d 944 (Fla. 3d DCA 1997) in support of its position. However, the defendant in Jan-jua was never questioned by police at all. *281 Following the defendant’s arrest, his father came to the police station on his own and requested to speak with his son. The two were permitted to speak, but only in the presence of a police officer. There was neither prior questioning by the police nor a claim that the overheard conversation between the defendant and his father was an exploitation of some initial illegality. Rather, Janjua presented a straightforward Innis claim that the conduct of the police in allowing the father and son to speak was the functional equivalent of interrogation. These distinguishing facts render Janjua unhelpful and inapplicable to the instant case.

. As to the State’s attenuation argument, there is a failure of proof. No evidence was presented to show how much time passed between the two statements. M.R. was in exactly the same physical location and position for both statements (in custody, handcuffed, in a police car, and in the presence of Officer Crocker), and there was no other evidence of any action or change in circumstances, other than the arrival of M.R.’s mother at the scene (pursuant to the unilateral request of the officer). This is insufficient to attenuate the taint of the initial illegality.